## MOBILE SCHOOL COMM'RS *vs.* PUTNAM ET AL.

[APPEAL FROM ORDER DISSOLVING INJUNCTION.]

1. "*Mobile School Commissioners ;*" *charter of, public in its nature, and may be altered or amended by the general assembly.*—The board of commissioners, known by the name of "The Mobile School Commissioners," as created by the act of 10th January, 1826, was an irregular *quasi* corporation, public in its nature, and so continued, under all the legislation in relation thereto, down to the adoption of the present constitution of the State, and, therefore, subject at all times to legislative control.

2. *Same; charter of, not a contract protected from impairment by constitution of United States.*—Said corporation was created for public ends and purposes, and not for private benefit or emolument ; the corporators had no property in the corporation, nor have they paid to the State any thing amounting to a valuable consideration, for its charter ; consequently, no contract existed between it and the State, the obligation of which is protected from impairment by the constitution of the United States.

3. *Board of education; power of, over public educational institutions.*—The board of education has full legislative powers in reference to the Mobile School Commissioners, and other public educational institutions ; and all the public educational institutions of the State are legally under the control and management of the superintendent of public instruction and the board of education.

4. "*Mobile School Commissioners ;*" *power of State over funds of.*—Although the State may not have the constitutional power to divert from the purposes of the trust, the funds which have been, and are, from time to time, increased and augmented from the bounties and revenues of the State, it may, nevertheless, in its discretion, change the administrators of these trust funds, and the manner and mode of its administration.

Mobile School Commissioners v. Putnam et al.

5. *Injunction; dissolution of, before answer of all defendants has come in, when proper.*—Generally, an injunction properly granted should not be dissolved until the answer of all the defendants has come in ; this rule is, however, subject to modification and discretion. Where there are more defendants than one, if the defendant, on whom the *gravamen* rests, to whom the facts charged are better known than to the other defendants, and within whose knowledge the facts must be, if they exist at all, has fully answered the bill, section 3438 of the Revised Code will authorize the dissolution of the injunction in vacation, without awaiting the answer of his co-defendants.

6. *School-moneys for Mobile county ; who only is authorized to draw from State treasury.*—Under the present laws of the State, the superintendent of education for Mobile county is the only person authorized to draw from the State treasury, moneys belonging to said county for the use of public schools therein.

7. *"Mobile School Commissioners ;" office of, when vacated.*—By the act of August 11th, 1868, the offices of the Mobile school commissioners became vacant. The words "other school officers" embraces school commissioners. If the complainants, claiming to be such commissioners, were elected or appointed after that date, they ceased to be such school commissioners, by virtue of the resolutions of the board of education of the 19th day of August, 1869.

8. *Board of education ; "full legislative powers" of, what embraces.*—The "full legislative powers" vested by the constitution in the "board of education," clothed it with all the powers which the general assembly might have exercised, if legislative power had not been conferred on the "board of education," in reference to the public educational institutions of the State. This power covers the whole field of legislation on this subject, including officers and agents to be employed, the mode and manner of their election or appointment, and their tenure of office; for what causes, and how and by whom removable; their duties and compensation, &c.

9. *Same ; session of, how long may continue.*—Under article 6, section 7, of the constitution, the board of education may continue in session twenty business days, not including Sundays ; and it does not require that they shall follow in successive order. There is no reason why the board of education may not take a recess, without having the recess counted against it.

10. *Same ; acts of, what will be presumed to sustain.*—If necessary to sustain the acts of the board of education, it will be presumed that the session was continued for a longer period than twenty days, "by authority of the governor."

11. *Same; general acts of, public acts.*—The general acts of the board of education are public acts of which the courts will take judicial notice, as of the other public acts of the State, and the same presumptions will be made in their favor.

12. *Same ; what act of, is not a law, in any accurate sense, and does not require approval of governor.*—A resolution of the board of education, approving or disapproving the appointment or removal of an officer, is not in any accurate sense a law, but is merely an administrative act,

and does not, therefore, require the approval of the governor to give it effect.

APPEAL from the Chancery Court of Mobile. Heard before Hon. A. C. FELDER.

This was a bill in equity exhibited in the chancery court of Mobile, by W. G. Clark and other persons claiming to be "the Mobile school commissioners," a corporation created and recognized by the laws of Alabama, against G. L. Putnam, N. B. Cloud, superintendent of public instruction, R. M. Reynolds, State auditor, and Arthur Bingham, State treasurer, praying for an injunction to prevent the payment to the defendant Putnam of certain moneys in the State treasury, which they allege are properly payable to them as such school commissioners, for the use of the public schools in Mobile county, and for general relief. Upon bond being given, an injunction was granted according to the prayer of the bill.

The original bill was amended by leave, before the hearing of the motion to dissolve the injunction, by averring that in addition to the sums of money raised by taxation from Mobile county alone, about $50,000 of which had been invested in real estate, &c., for the purposes of the public schools, under their control and possession as such commissioners, various citizens of Mobile, and others, had donated to their predecessors, in trust for the purposes of said public free schools, gifts amounting to many thousand dollars, some of which had been used, and the remainder invested in and about the purposes of the trusts confided to complainants as such school commissioners, &c.

Afterwards, upon the coming in of the answer of Putnam, without awaiting the answer of the other defendants, the chancellor, on motion in vacation, dissolved the injunction, and this decree is now assigned for error.

The opinion contains a synopsis of so much of the bill and the answer of Putnam as is material to a proper understanding of the decision.

P. HAMILTON, and RICE, SEMPLE & GOLDTHWAITE, for appellants.

ELMORE & GUNTER, and CHILTON & THORINGTON, *contra.*

PECK, C. J.—This case comes here on an appeal from a decretal order of the chancellor, dissolving an injunction heretofore granted, on the filing of the bill of complaint in this behalf.

Section 3439 of the Revised Code enacts, that such cases must be heard and determined at the first term of the court after such an appeal is taken.

The argument has just closed on this, the last day of the term, leaving but little time to consider and determine a question of so much gravity and importance.

From the best reflection we have, in so short a time, been able to give to it, we hold—1st, that " the Mobile school commissioners " constitute a public corporation, created for great public educational purposes, and that the charter of said corporation, being public in its character, may be altered and amended, at the will and pleasure of the general assembly of the State.— *The Trustees of the University of Alabama v. Winston,* 5 Stew. & Por. 17.

2d. That the funds provided for and devoted to the objects of this important trust, and which have been and are, from time to time, increased and augmented by the bounties and from the revenues of the State, although the State may not have the constitutional power to divert them from the purposes of the said trust, may, nevertheless, change the administrators of said trust funds, and, in her wisdom and discretion, direct the mode and manner of its administration, and how, and by whom, and to whom the funds devoted by the State for the purposes aforesaid are to be paid and applied.

3d. That the charter of said corporation does not constitute a contract between the State, on the one hand, and the said school commissioners on the other, the obligation of which is secured and protected from impairment by the constitution of the United States.

4th. That neither the present constitution of this State, nor the legislation of the board of education created by it, divert, nor are they designed to, nor have they or either

of them diverted, the said trust funds from the objects and purposes for which they were or are intended.

5th. That the bill of complaint, taken in connection with the answer of the defendant, said Putnam, does not show that the said trust funds have been, or are in danger of being, either wasted, diverted, or misapplied.

6th. That the educational institution in this behalf, with all other educational institutions in this State, are, legally, under the management and control of the superintendent of public instruction, and the board of education of this State, created by the constitution thereof; and that said board of education has full legislative powers in reference to it, and all other public educational institutions in the State, and that its acts, when approved of by the governor, or re-enacted, as provided in section 5 of article 11 of the constitution, have the force and effect of law, unless, and until, repealed by the general assembly.

For these, and other reasons not here named, we hold, that the said injunction heretofore granted was unadvisedly granted, and that the decretal order of the chancellor, dissolving the same, is right and free from error.

If it shall be deemed best, an opinion will hereafter be prepared and filed, setting forth more at length the reasons for affirming the order and decree of the chancellor in this behalf.

Let the decree of the court below, dissolving the injunction, be affirmed, and the appellants will pay the costs of said appeal in this court and in the court below.

NOTE BY REPORTER.—Upon the day upon which the foregoing opinion was read, the last day of the January term, the appellants petitioned for a rehearing, and afterwards filed the following argument in support thereof.

P. HAMILTON, and GOLDTHWAITE, RICE & SEMPLE, for appellants.—The principle upon which the bill rests is familiar, and is recognized and enforced in the *Mayor v. Rodgers*, 10 Ala. R. 37, and in the cases therein cited.

The corporation was created and its franchises conferred upon it, originally, by the act entitled " an act establishing

schools in the county of Mobile," approved January 10th, 1826, Pamphlet Acts of 1825-6, pp. 35, 36. The privileges or franchises thus granted, were not only continued, but added to, by successive acts of the general assembly of Alabama, down to and including the acts of 1854 and 1856. Pamph. Acts of 1853-4, pp. 190, 191; Pamph. Acts of 1855-6, pp. 148, 149.

Every thing (except " the funds arising from any sixteenth section,") which has heretofore been granted to said corporation, became [by mere force of the grant,] the property of the corporation, clogged only with the restrictions, that "the whole revenue arising to said board of commissioners shall be employed as a common fund for the instruction of the youth of said county;" and that no portion thereof shall be diverted to the maintenance or support of any school that is not strictly common to all children of the county, or to any that is under sectarian influence or control." And all this property, as well as revenue, "shall be under the control, direction and management of said commissioners," and be "appropriated and disbursed under the directions of the Mobile school commissioners."—See sections two and four of the act of 1854, above cited.

It is plain from the allegations of the bill, that Putnam and Cloud have heretofore acted, and are still continuing to act, in violation of these privileges or franchises conferred by statute upon the said commissioners ; and that unless Putnam and Cloud are restrained, they will disable these commissioners from using these statute franchises or privileges. Cloud and Putnam, by their conjoint action, have already [as the bill shows,] diverted over $5,000 of the trust fund, and are on the very eve of diverting nearly $10,000 more of it, in defiance of the statutes above cited, and are continually pursuing a line of policy which destroys "the direction, control and management of said commissioners" over the trust fund, and the right of said commissioners to direct the appropriation and disbursement of each and every portion of that fund.

No plainer case can be made for one of these special injunctions, which will not be dissolved before the final

hearing. The very nature of the grievance is such, that the injunction is the whole case. To dissolve it on mere answer, before final hearing or proof taken, is to arm a conscienceless perpetrator of irreparable injury with the power of continuing his irreparable mischief by swearing to and filing an unconscientious answer.—*McBrayer v. Hardin*, 7 Iredell's Eq. Rep. 1; *Purnell v. Daniels*, 8 Iredell's Eq. Rep. 9; *Poor v. Carleton*, 3 Sumner's Rep. 70; *Maxwell v. Ward*, 11 Prince's Rep. 17.

In dissolving the injunction in vacation, the chancellor not only violated the salutary rule last above called to view; but he also violated this other plain and sound rule, to-wit, "that an injunction properly granted, is not to be dissolved until the answer of all the defendants [who are charged with a knowledge of the facts or participation in the wrong,] has come in."—*Depeyster v. Graves*, 2 Johns. Ch. R. 148, 149.

The bill shows that Cloud is at least equally guilty of the wrong with Putnam; in fact, that Putnam could not have consummated any wrong in the way of obtaining and diverting the fund, but for Cloud's furnishing him with the certificate or instrument, which was essential to obtain either a warrant from the auditor, or money from the treasurer. And yet, without any answer from Cloud, the chancellor dissolved the injunction upon the answer of Putnam only!

Cloud's failure to answer, authorizes the inference that he could not swear to any such answer as that put in by Putnam. Now, suppose Cloud had answered, and admitted the allegations of the bill; does not every chancery lawyer see that a dissolution of the injunction upon Putnam's answer would have been wholly erroneous? It is equally erroneous to dissolve upon Putnam's answer alone, before Cloud has answered, and before any proof taken, and before final hearing.

The answer of Putnam does not deny these specific acts of his and of Cloud, which acts, in law, amount to a diversion of the fund, and to an interference with the franchises of complainant.

Even if the bill is defective as to matters which are

amendable, the rule is, that on motion to dissolve an injunction in vacation, all amendable defects in the bill will be considered as amended.—*Alabama and Florida Railroad Company v. Kenney*, 39 Ala. Rep. 307.

From what has already been above laid down, it is clear, that the bill makes a plain case for relief by injunction. The natural inquiry then is, do the facts, or any of them, stated in the answer of Putnam, have the legal effect of overturning or barring the right apparent upon the bill.

It is obvious, that the right asserted by the bill can not be overturned or barred by anything contained in Putnam's answer, unless the aforementioned franchises, granted to said commissioners, by the statutes above cited, "to the control, direction and management" of said property and funds, as well as to the appropriation and disbursement thereof, has been destroyed by the present constitution of Alabama, or by some valid law enacted since the adoption of that constitution. If that franchise survives, if it still exists, there is nothing in Putnam's answer which can bar the right to an injunction which is disclosed by the bill.

We proceed now to inquire whether each of these franchises was destroyed by any thing contained in our present constitution. In pursuing this inquiry we must remember, that the destruction of those several franchises, is, inevitably, the destruction of a system of education originated in 1826, nourished and cherished certainly down to the adoption of the constitution; and during all that long period operating so benignly, that it received from the very convention which framed the present constitution, not only friendly recognition, but unqualified favor and sanction. [Ordinance No. 21, passed November 30, 1867.] Deprive the commissioners of "the control, direction and management," and of the appropriation and disbursement of the funds by which only the system has been and is supported, and the system which they have built up and perfected, necessarily perishes. It would be strange indeed, after reading ordinance No. 21, above cited, to impute to the convention which adopted it, an intention, in framing the constitution, entirely antagonistic to the intention plainly

evinced by that ordinance. The argument for defendant, in effect, charges the convention with entertaining at the same time, contradictory intentions, as to the same old and well known system for educating "the youth of the county;" and the intent to destroy this system, is imputed to a convention which not only, by ordinance, evinced its intent to preserve the system, but also to add to its efficiency.

Upon the principle, so well illustrated in *Horton v. Mobile School Commissioners*, that the special controls the general, and that repeals by implication, of special laws and special systems, will not be made out by mere general words; it becomes evident, that there is nothing in the constitution which can justly be held to operate as a repeal or destruction of the franchises of the said school commissioners, or the special system under their control. The words used in article eleven of the constitution are the only words from which such repeals or destruction is claimed to result; and these words are merely general, and can be reconciled with the continued special system in Mobile. Thus, the words of the first section are, "the common schools, and other educational institutions of the State." These are words of description and restriction merely; they were used to describe, not the ownership of the schools or other educational institutions, but to indicate clearly, that the constitution was not designed to include all the schools and educational institutions in the State. If the design had been to include all, the words would have been as follows: " the common schools and other educational institutions in the State." What was meant by the words actually employed, was, the common schools and other educational institutions which the State had generally supported or aided in supporting, and over which the State had retained general control, without ever having vested their control or management in any special body or by any special system; for all these may well be called schools or institutions "of the State." But as far back as 1854 the "school system of the county of Mobile" is spoken of in the statute law, as "a public school system of its own," [that is, of Mobile county.] Hence, the framers of the constitution treated it as a school system of that county; and desiring to leave it un-

touched, used words, schools and institutions of the State, so as to distinguish between them and the special system of that county.—Pamph. Acts of 1853–4, p. 17, § 2.

The next position understood to be taken by the counsel for defendant, is, that even if the constitution did not destroy the said franchises of complainant, the acts of the board of education effected this destruction.

Ordinance twenty-one of the convention plainly recognizes the complainant as a legally existing corporation, and expressly reasserts and secures the rights of "the school commissioners of said county of Mobile" under the said act of February 15, 1856, and amounts to a recognition and re-enactment of the provisions of that act. Ordinance No. 33, of the same convention, virtually prohibits the repeal of any ordinance of that convention, except *"by the the legislature of this State, two-thirds of each house voting for the same."* This affirmation, that two-thirds of each house of the general assembly may repeal an ordinance, amounts to a *negation of* the right of the board of education to repeal one.— *Vallandigham's Case,* 1 Wallace, and cases there cited. And so, the act of the general assembly entitled, "An act to continue in force certain laws," approved July 29th, 1868, virtually prohibits the boards from repealing any constitutional laws found in the Revised Code. Every such law is thereby declared to be of full force, until repealed by this (legislature) or some succeeding legislature."—Pamph. Acts of 1868, p. 7. That act excludes a repeal by the board, of any law therein described.

The constitution does not confer on the board of education, the power to repeal or amend any ordinance of the convention, or any act of the general assembly. All the powers conferred on that board, by the constitution, must be held subordinate to the constitution and to the powers conferred by that instrument upon the general assembly. The constitution is not to be construed so as to make it the creator of two co-equal and co-ordinate legislatures upon any one subject. That would be not only absurd, but mischievous and destructive of that very harmony which it is the object of every government to secure. The relation established by the constitution between the board of edu-

cation and the general assembly, even as "to common schools and the educational institutions of the State," is that of inferior and superior; substantially the same relation as exists when the general assembly [as it often has done,] confers upon a strictly municipal corporation [as a city or town] legislative or governmental powers within its corporate limits. It is well settled, that in such cases, the municipal corporation, however general may be the words granting its governmental powers, can not repeal or amend an act of the general assembly. The board of education is nothing more, in its very nature, than such a municipal corporation. True, this board is created by the constitution, and derives its powers from that instrument. But that fact does not alter its nature, or make it equal to, or co-ordinate with, the general assembly on any subject. The only effect of that fact, is, that the general assembly can not, by its mere act, take away from the board the powers which were really conferred upon it by the constitution; whilst the general assembly may take away, by its own act, the governmental powers which it had conferred by its own act, upon any municipal corporation.

This view becomes conclusive upon a careful examination of article 11, of the constitution, in connection with articles 3 and 4. The two articles last mentioned clearly vest in, and confines to, the general assembly the whole legislative power of this State. Then the first section of article 11 proceeds to place the common schools and other educational institutions of the State, "under the management of a board of education;" and section 5, of this last mentioned article, declares that "the board of education shall exercise full legislative powers in reference to the public educational institutions of the State." It is, argued, that no limitation can be put upon these words, "full legislative powers." If this were so, it would follow that the board might exercise legislative powers, the exercise of which is prohibited both by the constitution of this State, and the United States. This can not be. The truth is, these words, however sweeping they may appear to be, are subject to limitations. These limitations are to be ascertained by the nature, provisions, and end of the entire

instrument in which they are found, and by the established rules for construing such instruments and such general words, when found in such instruments.  Guided by such considerations, the conclusion is easily reached, that the phrase "full legislative powers" occurring in the said 5th section of article. 11, must be construed to mean no more than such "full legislative powers" as may be necessary and proper to secure to the board of education merely "the management" of the educational institutions "of the State," embraced and mentioned in the first section of that article, and which at the same time must not be in conflict with any provision of any act of the general assembly, or of the constitution of this State, or of the constitution of the United States.  This is the only construction which can harmonize the various provisions of the constitution of the State, and allow some operation or effect to each sentence, clause, and word, thereof.  To effect such harmony, it is not unusual, but always proper, to narrow and limit the apparent scope of such sweeping words.—*May v. Robertson,* 13 Ala. R. 86.

This construction leaves a field of operation useful if not extensive—field of "management"—to the board of education; a field by the wise cultivation of which "the general interest of education" may be favorably "affected;" but by the unwise cultivation of which "the general interest of education" may be most unfavorably "affected."  Hence, the constitution imposes many restraints upon the board of education in this their appropriate field of legislation. Among these are the following : That "no rule or law affecting the general interest of education shall be made by the board without the concurrence of a majority of its members ;" that its acts shall have the force and effect of law, only "when approved by the governor, or when re-enacted by two-thirds of the board in case of his disapproval."—(*Vallandigham's Case,* 1 Wallace ;") that all its acts may be "repealed by the general assembly ;" that "the style of all acts of the board shall be, 'Be it enacted by the board of education of the State of Alabama ;'" and that "the board of education shall meet annually at the seat of government, at the same time as the general assembly ; but

no session shall continue longer than twenty days, nor shall more than one session be held in the same year, unless authorized by the governor."

This power of "management," which is the power conferred upon the board, so far from including the power to destroy any of the existing educational institutions of the State, imposes upon the board the duty of preserving them, and each of them. There is not a line or word in the constitution which gives to the board the power to destroy one of those institutions. But the clear intent of that instrument is, that the board may create schools and school districts—that the board must increase, but should not diminish the number of such institutions which it found in existence. This power to create, is expressly given in the 6th section of article XI. Is it not significant, that this power to create is expressly conferred, and that the power to destroy is not to be found in the instrument?

The following propositions are deemed incontrovertible, to-wit : 1st. That the constitution does not empower the board of education to repeal or amend or interfere with any ordinance of the convention which framed it or any act of the general-assembly ; 2d. Ordinance No. 33 of that convention virtually prohibits any repeal of any ordinance of said convention by said board ; 3d. The above mentioned act of the general-assembly of July 29th, 1868, virtually prohibits the repeal by said board of any constitutional law found in the Revised Code of Alabama.— Pamph. Acts of 1868, p. 7 ; 4th. Ordinance 21 of said convention, in its title as well as in its body, recognizes the legal existence of the Mobile school commissioners, and the existence of the rights of that corporation or "board" under the statute law which was enacted before the war ; 5th. The Revised Code, as adopted by said act of July, 1868, clearly recognizes the continuing legal existence of the "public school system" in the county of Mobile under statutory law passed before the war ; section 991 of that Code is in the following words, to-wit : "As the county of Mobile now has established a public school system of its own, the provisions of this chapter shall apply to that county only so far as to authorize and require its school

commissioners to draw the portion of the funds to which that county will be entitled under this chapter, and to make the reports to the superintendent" (not county, but State superintendent) " herein required ;" 6th. On the supposition that the matters pertaining to said school commissioners of Mobile, may be included among " the municipal affairs of Mobile," it is clear, that the act of the general assembly of August 6th, 1868, entitled " an act to provide for the qualification and appointment of State, county and municipal officers," carefully recognizes these affairs as legally existing, and provides " that nothing in that act shall be so construed as to interfere" with them.—Pamph. Acts of 1868, pp. 32, 33.

Notwithstanding these several recognitions by the convention which framed the constitution, and by the first general assembly thereunder, the board of education assumed that it had the power to change or destroy the system of public schools in Mobile which had been so long established, and which had been thus recognized by the convention and the general assembly. That board also assumed that it had the power to repeal any act of the general assembly " pertaining to the subject of education or in any way connected therewith."—(See the acts of that board purporting to be laws made by it, in the summer of 1868, and also its subsequent acts and resolutions.)

These acts, as well as resolutions of the board of education, in so far as they assume to impair the force of any ordinance of the convention, or any act of the general assembly, are utterly void, upon the grounds herein above disclosed. But independently of these grounds, these acts and resolutions are null and void, for other reasons hereinafter set forth.

Every act passed by the board of education in the summer of 1868, (except the single one which purports to have been approved July 30th, 1868, which makes provisions as to surplus moneys belonging to the school fund of the State of Alabama, and which certainly has no bearing on the present case), was passed more than twenty days after the day by law prescribed for the first meeting of the general assembly ! and is, for that reason, unconstitutional

and void.—See article 4, section 21, and article 11, section 9, of the constitution.

The day "by law prescribed" for the first meeting of the general assembly, was the 13th day of July, 1868. · That day was prescribed by, or (what is the same thing) in pursuance of the law of congress which validified our constitution and admitted Alabama and other southern States to representation in congress ; which law took effect on the 25th day of June, 1868.—Pamph. Acts of Congress of 1868, pp. 73, 74.

The general assembly actually had its first meeting on the day thus prescribed.  Whether the board of education actually met on that day or not, is wholly immaterial.  The " twenty days " which the constitution mentions as the duration of its session, began to run on that day, and continued to run until they ran out, whether the board was actually in session or not on any one of these " twenty days."  The board could not stop the operation of the constitution by its failure to meet " at the same time as the general assembly."  In counting these " twenty days," the courts can not except Sundays, because the constitution does not except Sundays in counting these " twenty days."  Wherever the constitution authorizes Sundays to be excepted, it makes the exception in express terms; for example, in counting the " five days " during which the governor may keep a bill which has passed both houses of the general assembly, the constitution expressly says, "Sundays excepted."—Art. 4, § 16.

The act of the general assembly entitled " An act to fix the day for the annual meeting of the general assembly of the State of Alabama," approved July 24th, 1868, furnishes no escape from the conclusion above reached, that the " twenty days " began on the 13th day of July, 1868, and continued to run, including Sundays, until the " twenty days " had run out.  That act speaks only from the day of its approval—that is, from the 24th day of July, 1868, and all it does say is as follows: " Section 1.  Be it enacted by the general assembly of Alabama, that the 13th day of July is hereby declared the day for the annual meeting of the general assembly of the State of Alabama."  That act

does not purport to be retrospective in any respect whatever. It does not say that the 13th day of July, 1868, shall be deemed and taken to be the day on which this general assembly began its annual meeting. The courts are bound to treat the act as prospective only, and as fixing the day on which any future annual meeting of the general assembly should commence. And this would have been its effect, if it had not been repealed before July 13th, 1869, and a different day prescribed for the meeting of the general assembly. This will be clear to all who notice that the constitution does not require that the general assembly shall meet on the same day in every year, but only that it " shall meet annually, on such day as may be by law prescribed."

Besides all this, the day " fixed for the first meeting of the legislature" of this State, under the constitution of this State, was fixed by the very act of congress which imparted validity to that constitution, and was so fixed in lieu of and substitution for the 18th day of March, 1868, the day which had been fixed by ordinance No. 32 for the first meeting of the legislature ; which last named day had passed before congress ratified the constitution. The act of congress which thus fixed the day, is conceded on all hands to be constitutional, and is therefore paramount to, and supreme over, any State law on that identical subject. The general assembly in 1868 could not unfix the day for its first meeting, because congress had fixed it as aforesaid. The meeting of the legislature on that day was the commencement of the first annual session of the general assembly.

Another fatal objection exists to the validity of the acts of the board of education, as laws "of this State," or as having " the force and effect of law ;" and it is equally applicable to all its acts and resolutions, whether passed in the summer of 1868 or subseqently. It may be intelligibly stated in the form following, to-wit :

The second section of the fourth article of the constitution explicitly provides, that " the style of the laws of this State shall be, " Be it enacted by the general assembly of Alabama." The fifth section of the eleventh article of the

34

constitution, after first providing that the board of education shall exercise full legislative powers in reference to the public educational institutions of the State, immediately qualifies that language by the following, to-wit : "and its acts," [that is, the acts of said board of education,] "when approved by the governor, or when re-enacted by two-thirds of the board, in case of his disapproval, shall have the force and effect of law, unless repealed by the general assembly." Now, here is a plain distinction drawn between those things which really are "the laws of this State," and those things which at best can only acquire "the force and effect of law," upon the occurrence of one of two well defined contingencies ; that is, "when approved by the governor, or when re-enacted by two-thirds of the board, in case of his disapproval."

It is not, in all cases, essential to the validity, or efficacy of a bill or resolution which has passed both houses of the *general assembly,* that the governor's approval thereto should appear, *or should have been, in fact, given.*—See Pamph. Acts of 1868, p. 134. The 16th section of the 4th article of the constitution provides, that "if the bill or resolution shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, *it shall have the same force and effect as if he had signed it,* unless the general assembly, by its adjournment, prevent its return, in which case it shall not be a law." There is no like provision in the constitution, as to any act of the board of education. The provision as to acts of that board is quoted above ; the effect of which is, that its acts can in no case acquire even "the force and effect of law," except "when approved *by the governor,* or when re-enacted by two-thirds of the board, in case of *his* disapproval." And this being so, the plain sequence is that no one of its acts can have the force and effect of law, unless it affirmatively appears, either that the governor has actually approved it, or that, after its actual disapproval by him, it was "re-enacted by two-thirds of the board." The numerous decisions, relating to the presumptions as to validity and jurisdiction which will be indulged where the acts of courts of *general jurisdiction* are drawn in question,

but will not be indulged where the acts of courts of *special jurisdiction* are drawn in question, furnish the apt illustration of the difference between the acts of the general assembly and the acts of the board of education. As to the acts of the general assembly, the presumption is always in favor of their validity, until the contrary appears. As to the acts of the board of education, there is no presumption in favor of their validity; and they must be treated as invalid unless their validity affirmatively appears.— *Thompson v. The Commissioners' Court*, 18 Ala. Rep. 694; *Mollett v. Keenan*, 22 Ala. Rep. 484.

Whoever claims under an act of that board, must plead it, and in his pleading must aver every thing essential to its validity. If he does not *allege* the facts essential to its validity, he can not be permitted to prove them; nor can the court judicially take notice of any such essential fact, which is not alleged. This rule applies with peculiar force to a motion, made in vacation, to dissolve an injunction upon the mere answer of defendant. On such motion the defendant can not be* permitted to avail himself of any fact not disclosed on the pleadings. The defendant here has not set up in his answer the facts essential to the validity of the acts of the board.

Another fatal objection to a large number of the acts of the board of education, is the plain disregard by that board of the following unbending rules established by the constitution, to-wit:

1st. "Each law shall contain *but one subject*, which shall be *clearly expressed* in *its title*."

2d. "No law shall be *revised or amended* unless the new act contains the *entire* act revised, or the section or sections amended; and the section or sections *so* amended shall be repealed."

The *resolutions* purporting to be adopted by the board of education, have not even a semblance of validity. There is nothing in the constitution which authorizes the board to pass any *resolution* which can possibly have the force and effect of law. But, on the contrary, the plain provision of the constitution is, that "the style of *all* acts of the board shall be"—"Be it enacted by the board of education

of the State of Alabama." In addition to this, the *resolutions* of the board do not even purport to be approved by the governor. And even its *acts* do not, as published, appear to have been approved *by the governor*. They simply purport to be "approved;" but do not show *by whom* they were approved. And *no presumption* can be indulged by the court, that the approval was by the governor.

The only other questions which will be discussed, are—1st, whether the several acts in relation to the Mobile school commissioners, passed by the general assembly of Alabama *before the war*, did not amount to *a contract* which was within the protecting power of that clause of the constitution of the United States which forbids any State from passing any law impairing the obligation of a contract; 2d, whether the success of the defense set up by Putnam's answer in this case, would not amount to a violation of the 14th amendment of the constitution of the United States, which prohibits a State from depriving "any person of life, liberty, or property, without due process of law," or from denying "to any person within its jurisdiction the equal protection of the laws," or to a violation of the provision of the constitution of the United States, which forbids the impairing of a contract by any law of a State.

We will not argue at length upon either of these last stated questions. But we respectfully ask the examination of the authorities we cite, to prove that the rights, franchises, and privileges conferred upon the complainant and its officers, are, under the constitution of the United States, as well as of this State, beyond impairment, either by its general assembly or convention ; and *a fortiori* by the board of education.

" The incorporated trustees (the school commissioners here are such) *form a third party to the contract*, which, there being *no reservation* to that effect, can no more be dissolved or changed, than it could have been originally made, *without their consent*."—Abbott's Digest of Law of Corporations, p. 158, section 123, referring to *City of Louisville v. University of Louisville*, 15 B. Monroe, 642.

The facts in the case last cited, like the facts in the present case, are essentially different from the facts upon

which *Trustees of the University of Alabama v. Winston*, 5 Stewart and Porter, p. 17, arose and was decided. Conceding this last mentioned case to have been correctly decided, it can not possibly control the present case, as will become evident upon comparing the grants and facts in the two cases together. The difference between them is clear ; and will be thoroughly seen and felt by an examination of the following authorities, which do apply to and ought to control the present case.—*Trustees for Vincennes University v. The State of Indiana*, 14 Howard, 276 ; *The Regents v. Williams*, 9 Gill and Johnson, 397 ; *Sheriff et al. v. Lowndes*, 16 Maryland Rep. 276 ; *Cleveland v. Stewart*, 3 Georgia Rep. 283 ; *The Trustees, &c., v. Bradbury*, 11 Maine Rep. (2 Fairfield) 119, and cases there cited ; Abbott's Dig. Law of Corp. pp. 160, 161, §§ 138 to 141 ; *Ibid*, 165, § 168 ; *Ibid*, 157, §§ 115, 116 ; *Ibid*, 158, §§ 123, 124 ; *Home of the Friendless v. Rouse*, December term, 1869, U. S. Supreme Court ; *State v. Heyward*, 3 Richardson Law Rep. (So. Ca.) 389, and cases there cited.

The corporation which sues in this case, is not strictly a public corporation. In the language of Chancellor Kent : " To hold a corporation to be public, because the charity was public, would be to confound the popular with the strictly legal sense of terms, and to jar with the whole current of decisions since the time of Lord Coke."—2 Kent's Com., 9th edition, marg. pp. 275-6, 305-6. In those public corporations, which are subject to legislative control, "there is, in reality, but one party, and the trustees or governors of the corporation are merely trustees for the public ;" consequently, there is nothing of contract in them. But in the present case there is a contract ; there are grants of property and of franchises, coupled with an interest, not in the children of the State generally, but only in the children of a single county ; these grants have been accepted, and these are beyond legislative control. To divest this corporation of such rights, privileges, and immunities, or the children of Mobile of such interest, is the exercise of *judicial* power.—2 Kent's Com., 9th edition, marg. p. 275, § 306 ; *Town of Pawlet v. Clark*, 9 Cranch's

Rep. p. 292 ; *State v. Heyward*, 3 Richardson's Law Rep. p. 389.

The following response was made to appellants' petition for a rehearing at the present term by—

PECK, C. J.—This case was disposed of at the last term, affirming the decree of the chancellor, dissolving the injunction granted on the filing of appellants' bill.

A petition for a re-hearing has been filed, and as the court had but little time then for the consideration of the questions involved, and none, for writing out the reasons that led to its conclusions, we propose now, in connection with the application for a rehearing, to give the case a more careful examination.

The first question then decided, is, "that the Mobile school commissioners constitute a public corporation, created for great public educational purposes, and that the charter of said corporation, being public in its character, may be altered or amended at the will and pleasure of the general assembly."

This is altogether the most important question in the whole case, and lies at the foundation of all the others, and if the conclusion to which we then arrived, be right, the difficulties in the case may be considered substantially removed, and the other part of the decision can hardly be wrong.

In determining the character of this corporation, we must discover, if possible, the intention of the legislature, and if that can be ascertained, we are bound to give it effect, if not in conflict with the constitution, whatever may be our opinion of its wisdom or policy.—*Bray et al. v. Edie*, 1 Term Rep. 313.

Blackstone, in his Commentaries, says, "the fairest and most natural method to interpret the will of the legislator is, by exploring his intentions at the time when the law was made, by signs the most natural and probable, and these signs are either the words, the context, the subject matter, the effect and consequences, or the spirit and reason of them all,"—2 Blackstone's Com. pp. 59, 60,

For this purpose, it is not improper to consider the state and condition of the city and county of Mobile, at the time the first act was passed, in the year 1826, entitled, "An act to establish schools in the county of Mobile."— Acts of 1826, p. 35.

Alabama had then been a State for about six years; it had not at that time any general system of public schools or education. The city of Mobile was comparatively a small town, and the inhabitants of the city and county, not one-fourth the present number, and the present number is, in all probability, not one-fourth what it will be fifty years hence. It was, however, an important place, and looked to, as soon to become the emporium of a great and prosperous State, numbering its inhabitants by hundreds of thousands.

Is it reasonable to presume, that the legislative body, by which that act was passed, supposed they were committing to a mere private corporation, for all time to come, the great trust of the public education, for so important a portion of the people of Alabama; and that, too, in such a way as to put it beyond the care and control of the legislative authority of the State? Such a presumption is altogether unreasonable—*perpetua lex est nullam legem, &c.*—and should not be entertained, unless the language employed is so clear and definite that no other rational interpretation can be given to it.

A fair interpretation of the whole act itself, will show that no such intention or purpose was contemplated, but, on the contrary, that the legislature intended to create a public board of commissioners, to be appointed by itself, and whose successors were to be elected by the people of the said city and county, as other public officers were elected; and that they were to have and exercise the powers conferred upon them by said act, for the purpose of establishing *public schools*, and to devise, put in force and execute, such plans and devices for the increase of knowledge, educating youth, and promoting the cause of learning in said county, as to them might appear expedient; and that this was to be done as a matter of public concern, and not

for private benefit or emolument; in other words, it was to be a public institution, and not a private corporation.

The commissioners to be appointed, were to have no private interest in the funds to be devoted for that public object and purpose, which were to be derived wholly from the bounties of the State and the United States, and certain revenue accruing to the treasury of said county from fines and forfeitures, a taxed fee of two dollars on all suits, in the circuit and county courts, together with twenty-five per cent. of the ordinary county tax of said county; all of which were set apart as a fund, not for the benefit of the commissioners, but as a special fund for the endowment and support of schools in said county.

No provision is made by which private bounties or benefactions were to be received, or used—the commissioners contributed nothing as individuals. There was neither stock nor stockholders; nor was any consideration paid by them, or by any other person, for the charter of incorporation, if such it can properly be called; it was wholly a matter of public concern, and for public benefit, and consequently, nothing in the nature of a contract was created between the State and said commissioners, or the people of the city and county of Mobile, either as a body corporate or as individuals. It was, and was intended to be, in all its essential characteristics and attributes, a public institution or corporation, created for public purposes, and, therefore, subject to be altered, amended, or even repealed, by the legislature.

The act provides that the number of commissioners should not be less than thirteen, nor more than twenty-five; and that seven members should constitute a quorum; that the board might appoint and employ a treasurer, and such other officers and servants as to them might appear proper, who should perform such duties and give such bonds as might be required by said board; that they should have the power to make by-laws and regulations, not inconsistent with the laws of the State or the United States, and to revoke and alter the same, and to prosecute all suits and actions in their corporate names, in the same manner as private persons. Nothing is said in said act as

to how they might be sued, or the manner of defending suits brought against them, if liable to be sued in their corporate name at all; these seem to have been the powers deemed necessary, to enable them to carry into effect the system of public schools intended to be established in and for the city and county of Mobile. The act then names twenty-four persons to constitute said board of commissioners. It is manifest, these persons so named were understood to be *mere public officers or servants*, without any private interests or property in said system of public schools, nor had they, like private corporations, any power to perpetuate themselves as a board of education, to appoint or elect their successors; that was to be done by the people by general ballot, in the same way and at the same time that the representatives of the general assembly were to be elected; these provisions are inconsistent with all our notions of a private act of incorporation; such provisions would utterly destroy the prosperity, and bring ruin upon any private corporate enterprise. We therefore hold, that this act created, and was intended to create, a system of public schools then believed to be necessary, for the people of the county of Mobile, and that the legislature retained the power to alter, amend, perfect, or repeal the same, as might in the future be thought best for the public good.

To prove the correctness of this conclusion, we propose to examine the subsequent legislation on this subject, from time to time, up to the adoption of the present constitution of the State.

The first act that we find relating to this matter is an act entitled "An act to authorize the Mobile school commissioners to raise a sum of money by lottery," approved 12th January, 1827.—Acts 1827, page 31. By this act, the said commissioners were authorized to raise by lottery the sum of $25,000, in aid of the fund for the support of schools in said county.

In 1841, an act was passed entitled "An act to extend the time for collecting the county *school* and road tax in the county of Mobile, for the year 1841, and for other purposes," approved December 10, 1841. By the 3d section, the tax collector for the county, for the year 1842, and

thereafter, was allowed until the 1st day of January in each year to make payment of the county, school and road tax of said county.

In 1845, another act was passed, entitled "An act to alter the organization of the board of commissioners of roads and revenue of Mobile county," approved 27th January, 1845. By the 5th section, the school commissioners of Mobile county were authorized and empowered to lease for a certain period, not exceeding five years, any lands appertaining to schools, for such rents and improvements as they might deem sufficient to the school fund; and by this section it is declared that five *members* shall constitute a quorum of said board of commissioners, instead of *seven*, as provided in said act of 1826.

By the 6th section, one-half of one per cent. is taxed upon sales by auctions, &c., in favor of said school fund, to be paid monthly to the officer appointed by said board to collect the same, and in case of refusal on demand, &c., said officer, on ten days notice, might move for judgment in the circuit or county court, against parties in default.

In 1852, an act was passed, entitled "An act to amend the laws regulating the board of Mobile school commissioners," approved February 9th, 1852.—Acts 1851–52, p. 463. The 3d section requires teachers in said county, before receiving any portion of the school fund of Mobile county, to procure from said board of school commissioners a certificate of competency, &c.

The 4th section altogether re-organized the said board of school commissioners, changing their number from not less than thirteen, and not more than twenty-five, to consist of twelve members only, one-fourth of which number were required to be from the country portion of the county, and to reside at least seven miles from the city of Mobile; and directs that on the first Monday in August, 1852, there should be eight of said board elected by the qualified electors of said county, two of whom should reside more than seven miles from said city; that these eight, or a majority of them, should meet together and elect by ballot four members from the old board of school commissioners, one of whom should be from the country portion of said county,

which, with the eight, should compose said new board. Said new board is then required to be divided into three classes, one of which to be elected every two years by the qualified electors of said county, &c.

All this was done without asking the assent or consent of the old board, or of the people of the city or county of Mobile. This clearly could not have been done, if the said commissioners had been a private corporation, and this being done without consent or objection on the part of the old board, shows conclusively, as we think, that both the legislature and the old as well as the new board of school commissioners, and the people of said city and county, held and understood the said system of public schools of said county to be a public institution, altogether within the power and under the control of the legislature, to mould and fashion it, or to abolish it altogether, as might be thought best to promote the public good, and in no wise a private corporation, that could not be meddled with by the legislature, without the request or with the consent of the corporate body itself.

Again, in 1854, another act was passed, entitled "An act to regulate the public schools in the county of Mobile," approved 16th January, 1854.—Acts 1853-4, p. 190. This title itself very sufficiently shows that what was to be regulated, was not the affairs of a private corporation, but a general system of public schools for the people of said county.

The first section provides, "that all laws and parts of laws relating to the establishment, organization and revenue of the board of school commissioners of the county of Mobile, excepting only the act entitled "An act to amend the laws regulating the board of Mobile school commissioners," approved February 9th, 1852 ; and the act entitled "An act to change the mode of receiving and disbursing the revenue of Mobile county, and for other purposes," approved February 9th, 1852, be and the same are hereby repealed.

Here, we see, the legislature went beyond amendment merely, and repealed the original act of 1826, by which the system was first called into being, and all the several acts

that followed it, except the two acts of 1852, above mentioned, and proceeded to authorize the board of Mobile school commissioners, as thus organized and existing, to establish and regulate a system of public schools in said county of Mobile, as to them might appear expedient, increasing their powers, and multiplying and enlarging the revenue to be devoted to that object and purpose, and providing that no portion of said revenues should be devoted to the maintenance or support of any school, not strictly common to all the children of said county, or that should be under sectarian influence or control.

The third section provides that said commissioners might elect, from their own body, a president and vice-president, and that said officers should serve, without compensation, and hold their offices for the term of two years. This act is a long one, covering about six pages, and it will be very imperfectly understood by fragmentary extracts from it; we, therefore, refer to the whole act. To us, it seems inconceivable that any real doubts should exist as to the character of the corporation created by it. It is unquestionably a public and not a private corporation, and it bears on its very face the evidence that the legislature intended to retain the power to alter and amend it, as time and experience might suggest, to improve and perfect it as a public institution. That such were the intentions of the legislature, we refer to section seven, which, among other things, requires the said board to keep full minutes of their proceedings, in well bound books, and, also, that they should annually transmit to the secretary of state, to be laid before the general assembly at its regular session, a full *statement of their receipts, disbursements and transactions* during each and every year. Is not that a clear indication that the general assembly did not intend to part with the power of legislation over the subject of public schools in the city and county of Mobile?

On the 14th of February, 1856, an act was passed, entitled " An act to render more efficient the system of free public schools in the State of Alabama."—Acts 1855–56, p. 33. By this act, a general system of free public schools was established in this State.

Article 1st of this act created a fund known as the educational fund, for the maintenance and carrying into effect said general system of education, after naming eleven different sources from which said fund was to be derived. The first section provides that the money composing said fund should be drawn from the treasury of the State, (except in the cases where it was otherwise ordered by said act,) and disbursed in the manner thereinafter directed.

Article 2d declares, that for the uniform and efficient administration of the system, the following officers should be appointed, with the powers and duties, and according to the manner herein provided :

1st. A superintendent of education throughout the State.

2d. A county superintendent of free public schools in each county.

3d. Three trustees of free public schools in each township.

The manner of electing these several officers is provided for in said act, and their duties prescribed.

The second section of article six of this act is as follows, to-wit : That as the county of Mobile now has established a public school system of its own, the provisions of this act shall apply to that county only so far as to authorize and require its school commissioners to draw the portion of the funds to which that county will be entitled under this act, and to make the report to the superintendent herein required.

The legislature that adopted that general system of public schools for the State, no doubt thought best to leave the system of public schools for the county of Mobile substantially unchanged, but no legitimate inference can be drawn from this, that it was understood or believed by that body, that it had not the power to change or abolish it, and to put it upon the same footing with the other counties of the State, if it had been thought wise and best to do so. We think the clear inference the other way, for the section cited does change that system in one respect, and if it had the power to change it at all, and impose any new duties upon the school commissioners of said county, it clearly had the power to change or suspend it altogether,

and to make the new system apply to said county, in all respects, as it applied to the other parts of the State.

The foregoing is, we believe, a true historical statement of the legislation as to the public schools in the said county of Mobile, beginning with the said act of the 10th January, 1826, entitled "An act establishing schools in the county of Mobile."

To carry into effect the purposes of the legislature, a board of commissioners were appointed by the name and style of "the Mobile school commissioners." The act no where calls this board a corporation, but the sixth section says, the board shall have power "to prosecute all suits and actions in their corporate name, in the same manner as private persons." By reference to the books, the real legal character of this board will be readily discovered; it was not, accurately speaking, a corporation in its completeness. It was invested with some of the powers and attributes usually exercised by corporations, but with such only as were thought necessary to enable it to accomplish the work for which it was created. There are many kinds of corporations, and one division of them is into public and private corporations, proper. There may be, oftentimes, more or less difficulty in determining whether a particular corporation is public or private.

Besides corporations, properly speaking, sometimes persons have a corporate capacity, for particular specified ends only, and are, therefore, called *quasi* corporations. Chancellor Kent, speaking of this kind and species of corporations, says : " In New York, each county, and the supervisors of a county, the law officers, and commissioners of lands, and the supervisors of towns, the overseers of the poor, the commissioners of common schools, commissioners of highways, and trustees of school districts, are invested with corporate attributes, *sub modo*."—2 Kent's Com. p. 278.

And on page 273 he says, besides the proper aggregate corporations, the inhabitants of any district, as counties, towns and school districts, incorporated by statute, with only particular powers, are sometimes called *quasi* corporations ; and as to these, he says, " no private action, unless

given by statute, lies against them as such corporations."
It necessarily follows, that such corporations are public in
their character, and, therefore, subject to legislative con-
trol. These are manifestly not the only corporations of
this sort, but are referred to as examples.

In the case of the *Trustees of the University of Alabama
v. Winston,* 5 S. & P. 17, the main question upon which
the merits of the case depended, was as to the character of
the plaintiff, whether a public or private corporation. On
this question, Judge Taylor, delivering the opinion of the
court, says : " If the property possessed by a corporation,
is altogether the property of the State ; if the corporators
have paid nothing, amounting to a *valuable consideration,*
for the act of incorporation ; in fine, if there is no contract
upon valuable consideration, between the State and the
corporators, it is a public corporation, and if it be public,
it is certainly within the complete control of the general
assembly."

We think, there can be no reasonable doubts as to the
character of the school commissioners of the county of
Mobile ; they were a mere *quasi* corporation, and in the
words of Judge Taylor, "within the complete control of
the legislature." We also hold, that the system of public
schools brought into existence by said act of the 10th of
January, 1826, and as changed, amended, re-organized and
continued by subsequent legislation, up to the time of the
adoption of the present constitution, was an educational
institution of this State, and by the 11th article, § 1, of
the constitution, was placed under the board of educa-
tion.

This article must be construed in connection with the
other parts of the constitution, and given a practicable,
common sense interpretation—an interpretation that will
enable the board of education to perform and accomplish
the great work committed to its charge ; that is, the man-
agement of the common schools, and the other public edu-
cational institutions of the State.

We have carefully examined the argument of the learned
counsel of the appellants upon this subject, and feel con-
strained to hold it to be hypercritical, and if adopted as

the true meaning of this article, it will cripple, if not destroy its usefulness, and render the administration of the system of education, intended to be built upon it, a disappointment and a failure.

The language of the first section of this article includes and embraces the common schools, and all the other public educational institutions of the State. It does not include private schools, conducted by individuals for their own profit and emolument, nor educational institutions, founded upon, and supported by private capital or endowments, although incorporated by the State, and, therefore, in a limited sense, public in their character. This is the view taken of it by the board of education, and we think correctly, as appears by section four of the act entitled "an act to secure co-operation with the bureau of refugees, freedmen and abandoned lands, and the several aid societies," approved 11th August, 1868. This section declares, "that all the schools of the State of Alabama, not maintained by private teachers for their benefit, shall be under the general direction of the board of education, and conducted as far as practicable, on the same general plan."— Act, 1868, p. 160.

The great system intended to be inaugurated under this article of the constitution, it was foreseen, would require legislative aid and assistance. This might have been left to the general assembly, but the convention, no doubt, believed the general assembly would be, to a great extent absorbed, and their time mostly employed with the many other subjects requiring legislation, and if not, its members would not so well know and understand the particular legislation necessary, to promote the best interests of education, as a board elected from all the congressional districts of the State with a view to their fitness, and having under their immediate management and supervision, the entire system itself ; and, moreover, the members being elected for four years, would have an experience hardly to be looked for in an ordinary legislative body.

For these, or for other reasons, satisfactory to the convention, the board of education, by the fifth section of this article, is clothed and invested with full legislative pow-

ers in reference to the public educational institutions of the State.

These full legislative powers cover the entire field of legislation upon this subject, including the officers and agents to be employed, the mode and manner of their election, or appointment, the tenure of their respective, offices, their duties, compensation, and for what causes, and by whom, they may be suspended or removed from office; these and any other matters requiring legislation, are necessarily embraced by the expression, "full legislative powers." "Full legislative powers," as here used, mean ample, complete, perfect powers, not wanting in any essential quality; otherwise, they would be limited, and not full powers; whatever, therefore, the general assembly might have done, if legislative powers had not been conferred upon the board of education, may be done by said board, in reference to the common schools, and other educational institutions of the State. Said board was not created to conduct and manage the old systems of education; they have the power to adopt such parts thereof, as they think proper, or to reject them altogether.

The fifth section of this article, not only confers upon this board full legislative powers, but declares that its acts, when approved by the governor, or when re-enacted by two-thirds of the board, in case of disapproval, shall have the force and effect of law, unless repealed by the general assembly. The general assembly has the power to repeal them, that is all; but, until repealed, they have the same force and effect as the acts of the general assembly itself. Furthermore, they are to be treated as public, and not private acts, and the courts will take judicial notice of them as they do of the other public laws of the State.

From the foregoing considerations, we perceive:

1st. That the board of commissioners, known by the name of "The Mobile School Commissioners," as created by the act of the 10th of January, 1826, was an irregular *quasi* corporation, public in its character, and so continued, under all the legislation in relation thereto, down to the adoption of the present constitution of the State, and, therefore, at all times subject to legislative control.

35

2d. That said corporation was created for public ends and purposes, and not for private benefit or emolument, and, consequently, no contract existed between it and the State, the obligation of which is secured and protected from impairment by the constitution of the United States.

3d. That by the said act of 1826, and by those that followed it on the same subject, a system of public schools and education was instituted and perfected for the benefit of the people of the county of Mobile, and was placed under the superintendence and management of said board of school commissioners, who received the funds and endowments provided for that purpose, and administered them, not on their own account, but for the public good, and, therefore, had no private interest in the same.

4. That by the said act of the 14th of February, 1856, a system of free public schools was established in this State, the first section of which declares that to carry into effect the provisions of our State constitution, which wisely declares that schools and the means of education shall forever be encouraged in this State, "to realize the objects of the general government in making grants and appropriations for the establishment of schools in each township, and to extend upon equal terms to all the children of our State the inestimable blessings of liberal instruction, the following system of the free public schools is hereby established in this State, and shall have the force and effect of law after the passage of this act." This system was provided for the State at large, but by section 2, article 6, it is enacted : "That as Mobile county now has established a public school system of its own, the provisions of this act shall apply to that county, only so far, as to authorize and require its school commissioners to draw the portion of the funds to which that county will be entitled under this act, and to make the reports to the superintendent herein required."

By the seventh section, article 6, money in the State treasury for educational purposes, was to be drawn by the county superintendents for their respective counties, except the county of Mobile; for that county, it was to be drawn

by the school commissioners, as stated in section 6, above copied.

5. By our present constitution, an educational system is provided for the entire State, and neither Mobile nor any other county is excepted or exempted from its provisions; all are embraced within it. This new system is essentially different from the systems that existed before it, created for the county of Mobile, and the State at large, and, consequently, they can not stand together. The old systems are necessarily repealed by the new, only continuing to enable the officers of the old systems to settle with and turn over the moneys and other things in their hands to the persons entitled to receive them under the new system. The old systems were beings of legislative creation, and existed by legislative permission, and were merely *administrative* in their character. The new has deeper foundations and powers unknown to the old systems; it has not only administrative, but full legislative powers as to all matters having reference to the common schools, and the public educational institutions of the State.

It cannot be destroyed, nor essentially changed by legislative authority; and, even the funds for its support do not depend upon legislative bounty, but are mainly provided by the constitution itself; this new system has, therefore, independent, permanent, constitutional existence, deriving its being and receiving its powers from the constitution, and not from the legislative authority of the State.

Having this understanding of the educational systems of the State, as they existed before and since the adoption of the present constitution, we are the better prepared to examine and comprehend the case made by the complainants, and the defense set up to defeat the relief sought by the bill of complaint.

1. The bill is filed in the name of certain persons claiming to be "The Mobile School Commissioners," a corporation created and recognized by the laws of the State of Alabama, and states that by the laws thereof they are entitled, as they believe, to the regulation, control and

management of the public schools, and public school system in the county of Mobile.

2. That the public schools in Mobile county are separately organized under its own peculiar laws, and that the public schools in the State at large are regulated and controlled by the general laws of the State.

3. That a portion of the funds applicable to the payment of the expenses of the public schools in Mobile county, is required to pass through the public treasury of the State, and are to be paid over to, and be disbursed in Mobile county by the school commissioners thereof.

4. That they are advised and believe, that in strict right and according to the law of the case, they are entitled to call directly for payment to themselves, or through their proper officer, of that portion of money in the State treasury applicable to the payment of the expenses of the public schools of Mobile county; but that N. B. Cloud, superintendent of public instruction for the State, insisted to them that this could only be done through a county superintendent of education for the county of Mobile, and that such an officer was necessary for other purposes in said county, as well as in any other county not having a separate school organization and system of its own, as had the county of Mobile.

5. That although they believed this unnecessary, they yielded to the opinion of said Cloud, as superintendent of public instruction as aforesaid; and about the twentieth of January, 1869, said Cloud appointed one Allen H. Ryland such county superintendent, and that they recognized him as such officer.

6. That under the views of said Cloud, it was necessary that the county superintendent should make to him a report at the close of each quarter, certifying the amount of current school expenses, whereupon, they were led to believe, said Cloud would immediately get the State auditor to draw his warrant on the treasurer in favor of said Ryland, for such current school expenses, upon the school fund in the State treasury belonging to the county of Mobile.

7. That upon this expectation, such reports were made

for the several quarters ending the 31st of December, 1868, the 31st March, 1869, and the 30th of June, 1869, certifying the current school expenses in Mobile county for each quarter; said report stating the amount of such expenses for each quarter respectively, which they allege were correct. But that said Cloud had absolutely refused to notify the State auditor of said amounts, or to take any steps to procure their payment, or to furnish any warrant for said amounts, or any of them, either to said Ryland or the complainants.

8. That on or after the 30th of June, 1869, said Cloud, without notice, under pretense of authority, and under the pretense that said Ryland had failed to discharge his duty, undertook to suspend him from his office, and to revoke his commission.

9. That one George L. Putnam, of Mobile county, claiming to have been appointed superintendent of education for said county, by said Cloud, about the month of January, 1869, made some sort of a certificate to said Cloud, superintendent of public instruction, and obtained a warrant of the State auditor for the sum of $5,327 20, or thereabouts, which amount said Putnam obtained from the State Treasurer, Arthur Bingham, under the pretense that it was to be applied to the payment of the current expenses of public schools in said county of Mobile, for the quarter ending the 31st of December, 1868, but they aver said moneys were not applied to the payment of the current expenses of public schools under their charge; and they further aver, that they are advised and believe, that by the laws of the State, all public schools in said county are required to be under their charge and control; and that the moneys that come to the county superintendent, should be placed under the charge of the Mobile school commissioners, and that the moneys so obtained by said Putnam, were unlawfully applied to schools not under their control, and a part thereof to his own use, without any warrant of law therefor.

10. That they are informed and believe, that large sums of money are in the State treasury that should be applied to the payment of the public schools in Mobile county for

the quarters before named, for which certificates of said A. H. Ryland, as county superintendent, had been furnished to said Cloud.

11. That said Cloud, under the pretense that said Ryland had been removed, as aforesaid, claims that in August, 1869, said Putnam was appointed county superintendent of Mobile county. But that said Putnam, as they were informed and believe, had not given bond as such alleged superintendent.

That said Putnam, claiming to be such superintendent, had made a certificate to said Cloud, for the sum of $9,-832 23, or thereabouts, for the payment of current school expenses for the quarter ending the 31st of March, 1869, and upon said certificate had obtained from said Cloud, a paper or statement, and had succeeded in procuring from R. M. Reynolds, State auditor, a warrant upon said Bingham, treasurer, for the said sum of $9,832 23, and was seeking payment from said treasurer.

12. That complainants are informed and believe, that said Cloud and Putnam, are confederating together to prevent the application of said $9,832 23, to the payment of the present school expenses of the quarters that are already passed, and that said Cloud aided said Putnam in the misapplication of the moneys received by him as aforesaid. That said Cloud and Putnam refuse to recognize complainants as the school commissioners of the county of Mobile, pretending that other persons are the school commissioners of said county, and that they have the power to recognize them as such; whereas, complainants charge, that they are the school commissioners of said county, duly elected and appointed thereto, and have never been removed, or their offices made vacant; that they are so advised by counsel, and believe the same, and that said Ryland, if there is any such office in existence, is county superintendent of said county, under the appointment of said Cloud, superintendent of public instruction, and has not been legally removed from said office; that said Putnam is not superintendent of education of said county, and has no authority to act as such.

That said Putnam, claiming to be such superintendent,

has heretofore drawn moneys from the treasury, which he did not apply according to law, and is seeking to draw other moneys, particularly the said sum of $9,832 23 called for by said warrant, so obtained by him, &c., as aforesaid, and which they believe and charge he will apply in a manner not warranted by law, unless prevented by the interposition of the court, and that said Cloud is aiding him in said proceedings.

13. Complainants further state, that they are advised and believe, that the moneys in the treasury applicable to the expenses of public schools in said county are properly payable directly to them or to said Ryland, as county superintendent of said county; but that they are advised and believe, that there is no valid legislation of the board of education, under which any such office as that of county superintendent of education for Mobile county has been created. The reasons alleged are, that when the pretended action of said board under which said Putnam claims to hold said office took place and was had, there was not a majority of the members of said board present, and that said action was had without a quorum of said board.

Complainants state that they have no adequate remedy at law, and pray that said Putnam, said Cloud, superintendent of public instruction, said Reynolds, auditor of public accounts, and said Bingham, treasurer, be made parties defendant, and required to answer said bill of complaint, but not on oath, and that an injunction may be granted and issued to all of said persons, &c., and that on a final hearing the same be made perpetual; an injunction was therefore issued.

The defendant Putnam filed a full answer on oath, and in vacation moved the chancellor to have the said injunction dissolved, which was done.

Said Putnam, in his answer, denies that complainants, as he is advised and believes, are the school commissioners of Mobile county; that they were at one time such commissioners, but had been suspended from office by said Cloud, superintendent of public instruction, and that their suspension had been confirmed by the board of education, and their offices declared vacant; and he appends a copy of

the resolutions of said board to his answer as an exhibit, bearing date the 19th of August, 1869; he also answers that other persons, without naming them, had been appointed in their place.

He denies that the system of public schools for the county of Mobile is a system separate and apart from that of the State at large, in the sense of its not being under the control and management of the board of education of the State.

He admits that said Ryland was appointed superintendent of education of Mobile county by said Cloud, subject to the approval of the board of education; that said board refused to approve of said appointment, and approved of the subsequent revocation of the same by said Cloud; and he appends as an exhibit to his answer a copy of the resolutions of the said board of education on the subject, dated the 19th day of August, 1869; and, therefore, denies that said Ryland is superintendent of education for said county, but avers that he, said Putnam, is such superintendent, and thereto appointed by said Cloud, superintendent of public instruction, on the 6th day of July, 1869; and he states that he appends to his answer as a part thereof, a copy of his appointment as an exhibit; that he gave bond according to law, and entered upon and was discharging the duties of said office, as lawfully he might.

He denies that complainants, or the Mobile school commissioners, whoever they may be, have any legal authority to draw from the State treasury the moneys therein properly belonging to the county of Mobile for the support of free public schools; but says he, said Putnam, county superintendent, is the person, and the only person legally entitled to draw and receive from the State treasury the moneys for that purpose.

He admits that he, as superintendent of education for said county, had drawn the said sum of $5,327 20, but denies that he had misapplied any part of it. He admits, that by the aid of said Cloud, as superintendent of public instruction, and on his certificate, he had obtained the warrant of said Reynolds, auditor, &c., for the said sum of $9,832 23 as stated, and that he should have collected the

same, as lawfully he might, if he had not been enjoined from so doing.

He also denies all confederacy, &c.

We think the foregoing syllabus of the bill and answer, sufficient to a proper understanding of what remains to be said in this opinion.

In addition to the questions already disposed of, we now propose to examine those that have a more immediate reference to the propriety of the granting and dissolving of the injunction in this case.

If the complainants are not "the Mobile school commissioners," or if the Mobile school commissioners, whoever they may be, are not as the law now stands, legally entitled to draw from the State treasury the moneys therein properly belonging to the county of Mobile for the support of free public schools in said county; but, if the defendant Putnam, is the superintendent of education for said county, and, as such superintendent, is the person legally authorized to draw and receive said moneys for that purpose, then the injunction was unadvisedly granted, and the chancellor committed no error in its dissolution.

These questions must necessarily be decided and determined by an examination, in connection with the bill and answer, of the XI article of the constitution, and the legislative and other proceedings of the board of education on this subject.

Before entering upon this examination, we will dispose of a preliminary objection made by complainants' counsel in his printed argument, to-wit: that the chancellor proceeded to hear and determine the motion made in vacation to dissolve, and did dissolve the injunction, before the other defendants had answered the complainants' bill of complaint.

This motion was made under section 3438 of the Revised Code, which is in the following words, to-wit: " A defendant may move to dissolve an injunction in vacation before the chancellor of the division in which the bill is filed, either for the want of equity or on the coming in of the answer, to be heard on certified copies of the bill and answer, but ten

days notice of such application must be given to the plaintiff or his solicitors."

We think a fair interpretation of this language will authorize a motion for the dissolution of an injunction, upon a full answer of a single defendant, where there are more than one within whose knowledge the facts charged in the bill must be, if they exist at all.—*Dunlap v. Clements et al.*, 7 Ala. 539.

Chancellor Kent says, " the general rule is, that an injunction, properly granted, is not to be dissolved until the answer of all the defendants has come in. But this rule has exceptions, and is subject to discretion and modification. If both the defendants were implicated in the same charge, I should require the answer of both, without some special reason. If, however, the defendant, on whom the real *gravamen* rested, had fully answered the bill, this would probably be sufficient, and in many cases the injunction will be dissolved, as against the defendants who had answered."— *Depeyster v. Graves et al.*, 2 Johnson's Ch. Rep. 148.

We hold, the discretion here spoken of should be liberally exercised, where, as under our practice, the oath of defendants to the answers is waived.

In this case, the defendant Putnam knows better, or certainly as well, the material facts charged, as either of the other defendants ; and besides, he is more deeply interested in the dissolution of this injunction than either of the others. As he had fully answered the bill, he was entitled to have his motion considered without waiting for the answer of the other defendants. Furthermore, if the defendants had answered, as the oath to their answer is waived by the plaintiffs, they most probably would have answered without oath, and then their answer could not be considered ; and it would be a great hardship, where the oath of defendants is waived by the plaintiff, not to permit a defendant mainly injured by an injunction granted in such a case, to move for its dissolution on a full answer on oath, denying the equities of the complainants' bill.

There is another sufficient answer to this objection. The record does not show that it was made before the chancellor, and it is too late to make it for the first time in this

court on an appeal. This objection being disposed of, we will now enter upon the examination of the questions having immediate reference to the correctness of the decretal order of the chancellor dissolving the injunction.

Neither the bill nor the answer gives us any information when the complainants were elected or appointed to the office of the Mobile school commissioners—whether under the old or new *regime*.

If they were elected or appointed before the 11th day of August, 1868, then their offices became vacant on that day by virtue of an act of the board of education, entitled " An act to declare all school offices vacant, and to supervise all existing school contracts," approved August 11th, 1868.—Acts 1868, p. 148.

By the first section of this act, it is declared " that all offices of county superintendents, township trustees, and school commissioners, are hereby declared vacant." This act clearly embraces " the Mobile school commissioners."

The board of education, in the passage of this act, followed the example of the general assembly, which, on the 6th of August, 1868, by an act entitled " An act to provide for the qualification of State, county and municipal officers," declared " that all offices, State, county and municipal, in this State, were, on the 12th of July, 1868, deemed and considered vacant."—Acts 1868, p. 32.

We are led to infer that the complainants came to their office of Mobile school commissioners after the date of the said act of the 11th of August, 1868. Whether this be so or not, by an act of the said board of education, approved the 5th day of August, 1868, entitled " An act to define the duties of the superintendent of public instruction," they were, for failing to discharge their duties, or for violating any of the rules or regulations of said board, subject to be suspended from their office by the superintendent of public instruction until their case should be investigated at the next ensuing meeting of said board.—Section 8, Acts 1868, page 154.

The officers directly named in this act are, county superintendents, trustees, school directors, and *other school officers*. The words, " other school officers," very clearly embraces

school commissioners, and all other school officers, by whatever name known or called, and so they seem to be understood and interpreted by the board of education.

Under the authority of this act, the superintendent of public instruction suspended the complainants from their offices of Mobile school commisioners, on the 30th day of June, 1869; and on the 19th day of August following his action in the premises was approved by the board of education, and their offices declared vacant by a resolution of that date, which is in the words and figures following, to-wit:

"Whereas, the following named persons, acting as a board of school commissioners for Mobile county, to-wit: G. Horton, W. G. Clark, F. G. Bromberg, A. M. Granger, James Baird, J. Carter, R. W. Coale, Charles Mohr, Albert Stein, R. S. Watkins, and A. H. Ryland, having disregarded the instructions of the superintendent of public instruction, and the acts passed by this board, and having violated the free public school laws of this State, and having in various ways failed in the discharge of duty; therefore—

"*Be it resolved*, That the action of the superintendent of public instruction, as set forth in his order dated June the 30th, 1869, suspending the above named school commissioners for Mobile county from office, is hereby approved, and their offices declared vacant. Passed August 19th, 1869."

On the same day, a similar resolution was passed by the said board of education, in relation to the said Allen H. Ryland, to whose appointment as superintendent of education for Mobile county, the complainants state, they yielded their consent, at the instance of said Cloud, superintendent of public instruction, and recognized him as such officer. Said resolution is as follows, to-wit:

"*Be it resolved by the board of education of the State of Alabama*, That the appointment of A. H. Ryland, as superintendent of education for Mobile county, is not approved, and that we sustain the action of the superintendent of public instruction, in revoking the commission appointing said A. H. Ryland superintendent of education of said county. Passed August 19, 1869."

The basis upon which the complainants obtained the injunction in this case, is that they were the Mobile school commissioners, and, as such commissioners, were authorized to draw from the treasury of the State the moneys properly belonging to the said county for the support of the public schools thereof, and if they were not, that then the said Ryland, as superintendent of education, was ; and that when so drawn, they were entitled to the same, to be applied and disbursed for that purpose.

If there is any vital energy and validity in the said resolutions, the complainants ceased to be the school commissioners, and the said Ryland ceased to be the superintendent of education for said county of Mobile, on the said 19th day of August, 1869, the day said resolutions were passed.

But it is objected by complainants' counsel, that these resolutions are invalid, because there is nothing in the constitution that authorizes the board of education to pass any resolutions *which have the force and effect of law ;* and because they not do purport to be approved by the governor.

It is a sufficient answer to these objections, that said resolutions are *administrative, and not legislative acts,* and although valid for the purposes intended, do not claim to be laws in the sense that the legislative acts of said board are laws, and, therefore, the approval of the governor is not necessary. Every person having any considerable knowledge of parliamentary proceedings, knows that it is a common thing in this country for legislative bodies to pass resolutions that have, in no accurate sense, the force of laws, and, therefore, the approval of the governor is not necessary to give them effect. The 16th section, article 5th, of the constitution declares, that " every bill or resolution *having the force of law,* to which the concurrence of both houses of the general assembly may be necessary, except on a question of adjournment, which shall have passed both houses, shall be presented to the governor for his approval," showing that there are resolutions that have not the force of law in the sense in which that word is used in this section. Take, as an example, resolutions requesting

members of congress, and instructing senators to vote in a certain way on some particular measure, before congress. Such resolutions, although commonly in form, joint resolutions, and although it is usual for them to be approved by the governor, yet it is certain they need not be so approved, because they are not laws; for if laws, the senators, at least, would have to obey them, which we know is not always the case.

The 2d section of said article declares that the style of the laws of this State, shall be, "*Be it enacted by the General Assembly of Alabama.*" No resolution, passed by the general assembly, with the approval of the governor, and having the force of law, has this "style." If it had, it would not be a resolution, but an act. In a proceeding to suspend an officer from his office, under the act above referred to, the approval or disapproval of the board of education, is appropriately expressed by resolution, and the approval of such a resolution by the governor, is not necessary to give it effect.

Let us now inquire as to the only remaining question necessary to be disposed of on the present application for a rehearing, to-wit: How, and by whom, money in the treasury of the State, for the use of free public schools, belonging to the county of Mobile, is to be drawn and received.

This question, as it appears to us, is settled by the seventh section, article one, of said act of the 5th of August, 1868.—(Acts 1868, p. 154.) By that section, it is enacted "that the superintendent of public instruction shall certify the apportionment of the school fund income to the State auditor, and shall at once notify each county superintendent, stating the amount apportioned to his county. The county superintendent shall, at the close of each quarter, certify the amount of current school expenses for that quarter, to the superintendent of public instruction, who shall notify the State auditor of said amount, and the State auditor shall immediately draw his warrant on the State treasurer, *in favor of the county superintendent* for such current expenses, upon the school fund in the State treasury belonging to said county.

This section applies to the county of Mobile, as well as to the other counties of the State. The language is general, and there is no proviso excepting any county from its operation.

This construction harmonizes with and is sustained by the following section of the school laws of the board of education. Section one, of article two, of this same act says, "there shall be appointed by the superintendent of public instruction, subject to the approval of the board of education, a person qualified to discharge the duties of superintendent of *education in each county of the State,* who shall hold his office for two years, or until his successor is elected and qualified.

The second section of an act entitled "an act in relation to schools in the city and county of Mobile, approved August 11th, 1868," provides "that there shall be a superintendent appointed for the free public schools of the county of Mobile, to be compensated as the school commissioners may decide, subject to the approval of the superintendent of public instruction, *with the same duties and powers as other county superintendents.*

From these references, we are unable to resist the conclusion that the county superintendent of education for Mobile county, is the only person authorized to draw from the State treasury, and receive the moneys therein, belonging to said county, for the support of the public schools in the same.

It is, however, insisted by complainants' counsel, that these acts of the board of education are unconstitutional and void, because they were passed more than twenty days after the day by law prescribed for the first meeting of the general assembly of this State,—the 13th day of July, 1868,—and article 11, section 9 of the constitution is referred to. This section is as follows, to-wit : " The board of education shall meet annually at the seat of government, at the same time as the general assembly, but no session shall continue longer than twenty days, nor shall more than one session be held in the same year, unless authorized by the governor." By this section, as interpreted by the complainants' counsel, the constitutional term of the

session of the board of education ended after the lapse of
twenty current consecutive days, from the said 13th day
of July, 1868, including Sundays.

This is a construction altogether too narrow and tech-
nical, even admitting that the phrase " at the same time as
the general assembly," as here used, is equivalent to say-
ing, " the board of education shall meet *on the same day*
appointed for the meeting of the general assembly," which
we think it is not.

The constitution manifestly intends to give the board of
education at least twenty business days, but it does not
require that they shall follow in successive order.    We
can see no reason why the board may not take a recess
during the session, as is often done by the general assem-
bly, without having the days of a recess counted against
it.

The constitution is not to be construed like an ordinary
statute of limitations.

Furthermore, if necessary to sustain its legislative acts,
it should be presumed that the session was continued for a
longer period than twenty days, " by authority of the gov-
ernor."

The governor may unquestionably authorize a session
to continue beyond the period of twenty days ; unless
" authorized by the governor," as used in this section, is
an expression adverbial in its character, and intended to
qualify both the preceding members of the sentence, with-
out the necessity of a repetition.    If the sentence is written
out at length, without the illipsis, it will read thus : no ses-
sion shall continue longer than twenty days, "unless au-
thorized by the governor ;" nor shall more than one ses-
sion be held in the same year, " unless authorized by the
governor."

Besides all this, we find these acts of the board of edu-
cation bound up in the same book with the laws of the
general assembly, and published by authority.    Mr. Green-
leaf, in his first volume on Evidence, § 480, says : " In
most, if not all, of the United States, the printed copies
of the laws and resolutions of the legislature, published
by its authority,  are competent evidence, either by statute

or judicial decisions, and it is sufficient *prima facie* that the book purports to have been so printed."—See, also, § 489.

The same presumptions are to be made in favor of the acts of the board of education as are made in favor of the acts of the general assembly. *Prima facie*, therefore, we will presume these acts were passed both by a lawful board and at a lawful session of the board of education. The analogy attempted to be established between courts of limited jurisdiction and the legislative jurisdiction and powers of the board of education, is without foundation. The legislative jurisdiction or power of the board of education, is not limited, but general and full, as to all matters in reference to common schools and the educational institutions of the State; and, consequently, the general acts of said board are not private but public acts, of which the courts will take notice without requiring them to be specially pleaded.

The other objections made to these acts, although not here specially noticed, have been patiently examined, and we are persuaded they are insufficient to authorize us to hold and declare them invalid.

On the motion to dissolve the injunction, the defendant, Putnam, must be held to be the superintendent of education for the county of Mobile. His answer as to this is responsive to the bill. The bill states that he claims to be such superintendent, by the appointment of the superintendent of public instruction, and he answers that he is such and attaches a copy of his appointment to his answer, as an exhibit. Besides, this is a fact within his own knowledge, and he states it as such. The answer is sworn to, and for the purpose of said motion, must be taken to be true.

The foregoing considerations satisfy us that the decision made in this case at the last term is right; it must, therefore, stand as the judgment of the court.

The application for a rehearing is denied, at the costs of the appellants.