RITCHMOUNT PARTNERSHIP ET AL. *v.* BOARD OF
SUPERVISORS OF ELECTIONS FOR ANNE
ARUNDEL COUNTY, MARYLAND ET AL.

[No. 161, September Term, 1977.]

\* \* \*

REFUSE DISPOSAL OF MARYLAND, INC. *v.* BOARD
OF SUPERVISORS OF ELECTIONS FOR ANNE
ARUNDEL COUNTY, MARYLAND ET AL.

[No. 162, September Term, 1977.]

*Decided June 26, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*William C. Mitchell, Jr.,* with whom was *C. Bowie Rose* on the brief, for appellant Ritchmount Partnership et al. *Thomas M. Downs* and *C. Fred Delavan,* with whom was *Harry C. Blumenthal* on the brief, for appellant Refuse Disposal of Maryland, Inc.

*Robert C. Wilcox* and *Frederick C. Sussman, Assistant County Solicitors,* with whom were *Michael R. Roblyer, County Solicitor,* and *Emile J. Henault, Jr.,* on the brief for Board of Supervisors of Elections for Anne Arundel County, for Anne Arundel County, Maryland, appellees.

LEVINE, J., delivered the opinion of the Court.

We consider in these two appeals the constitutionality of Article III, § 308 of the Charter of Anne Arundel County and specifically whether the people of a home rule county may

confer upon themselves the power of referendum over local legislative enactments, where such power was neither delegated by act of the General Assembly nor expressly reserved to the inhabitants of charter counties by the Constitution of this State.[1]

In ratifying § 308, the voters of Anne Arundel County sought to retain the right to approve or reject by way of petition and popular election ordinances of the Anne Arundel County Council. Appellants, who own real property situated in northern Anne Arundel County, instituted these separate suits in the Circuit Court for Anne Arundel County (Childs, J.), challenging the validity of § 308 and a 1974 zoning referendum held pursuant thereto.[2] The trial court issued a declaratory decree upholding the referendum article and election. Because of the singular importance of the constitutional question to the fundamental structure and administration of local government in Maryland, we granted certiorari to review these companion cases prior to their consideration by the Court of Special Appeals. We now affirm.

Early in October 1972, the Anne Arundel County Council (the County Council) enacted Bill No. 136-72, adopting comprehensive zoning maps for the northern portion of the County's third assessment district in which appellants' property is located. That same day the County Council gave its approval to a total of 97 individual amendments, 14 of which were successfully vetoed by the County Executive.[3] The remaining 83 amendments and original Bill No. 136-72 finally went into effect on December 2, 1972. As a result of the passage of Bill No. 136-72, appellants' properties were reclassified to permit commercial and light industrial uses in lieu of prior primarily residential restrictions.

---

1. Since both appeals here involve identical questions of law and arise out of virtually identical factual settings, we shall, for the sake of economy and clarity, decide these cases in a single opinion. *See* Gov't Employees Ins. v. Ins. Comm'r, 273 Md. 467, 468, 330 A. 2d 653 (1975).

2. Named as defendants in both actions were Anne Arundel County and the members of the Board of Supervisors of Elections of Anne Arundel County.

3. Actually the County Executive cast 34 item vetoes, 20 of which were subsequently overridden by vote of the County Council.

In the meantime, a contingent of property owners dissatisfied with the 1972 zoning legislation commenced a suit in equity to restrain County authorities from enforcing Bill No. 136-72. The Circuit Court for Anne Arundel County granted the desired relief, declaring the ordinance to be void in its entirety on account of the County Council's failure to comply strictly with the dictates of § 307 of the county charter setting forth certain procedural requirements for the amendment of local ordinances. On appeal this Court, in *Anne Arundel County v. Moushabek,* 269 Md. 419, 430-31, 306 A. 2d 517 (1973), affirmed the decision of the chancellor insofar as it invalidated all 83 amendments, but modified the decree so as to resurrect the original unamended version of Bill No. 136-72.

In the wake of *Moushabek,* the County Council acted swiftly to pass emergency legislation, Bill No. 52-73, which was designed to repeal what remained of Bill No. 136-72 and reenact it, this time with the provisions of the judicially stricken 83 amendments incorporated directly into the text of the new law. Instead of challenging the new ordinance through litigation, opponents of this latest zoning action undertook to defeat it by appealing to the voters of Anne Arundel County. Accordingly, a petition for referendum bearing the requisite number of signatures was filed in timely fashion with the Board of Supervisors of Elections of Anne Arundel County (the Elections Board), which, in accordance with the provisions of § 308 of the Charter, ordered the question placed on the ballot for the upcoming general election.[4] On November 5, 1974, the voters of Anne Arundel County rejected Bill No. 52-73 by a decisive margin.

---

4. Article III, § 308 of the Charter of Anne Arundel County provides in relevant part:

"(a) *Scope of the referendum.* The people of Anne Arundel County reserve to themselves the power known as 'The Referendum,' by petition to have submitted to the registered voters of the County, to approve or reject at the polls, any ordinance or part of any ordinance of the County Council. The referendum petition against any such ordinance shall be sufficient if signed by ten per centum of the qualified voters of the County calculated upon the whole number of votes cast in the County for Governor at the last preceding gubernatorial election. Such petition shall be filed with the Board of Supervisors of Elections of Anne Arundel County within forty-five days after the ordinance becomes law."

In an effort to annul the results of the November referendum and thereby to revive the ill-fated Bill No. 52-73, appellants commenced the present actions, claiming that the Elections Board lacked authority to approve the citizen referendum petitions. It was argued that § 308, which created the right to hold local referenda in the first instance, was itself invalid, being an exercise of power allegedly in excess of that vested in counties adopting a charter form of government under the Home Rule Amendment to the State Constitution, Md. Const., Art. XI-A, and the Express Powers Act, Maryland Code (1957, 1973 Repl. Vol. & 1977 Cum. Supp.) Art. 25A, § 1 *et seq.*

Ruling in favor of the constitutionality of the charter referendum article, the lower court concluded that Bill No. 52-73 had been properly presented to the electorate of Anne Arundel County and therefore had been effectively repealed. In so holding, the chancellor was thus required to ascertain what, if any, prior zoning legislation governed the permissible use of appellants' real estate following the popular repudiation of Bill No. 52-73. Rejecting appellants' suggestion that the repeal of Bill No. 52-73 had created a zoning vacuum, leaving their property free from land use controls altogether, the trial court ruled that the defeat of the ordinance automatically revived predecessor Bill No. 136-72 in its unamended form — a result which, in the chancellor's opinion, was mandated by our holding in *Anne Arundel County v. Moushabek, supra,* 269 Md. 419.

In the appeals before us, appellants challenge both the legality and effect of the 1974 zoning referendum. We turn first to the question of the constitutionality of the Anne Arundel County charter referendum article.

# I

The crux of appellants' constitutional assault on § 308 is that when the people of Anne Arundel County framed and ratified their county charter in 1964, they, like the inhabitants of the state's seven other charter counties (Baltimore, Harford, Howard, Montgomery, Prince George's, Talbot, and

Wicomico), possessed no power to repeal or amend legislative enactments of the County Council, except that which had been explicitly conferred upon them by organic or statutory law. It is argued that, save for certain provisions relating to the issuance of county bonds (Art. 25A, § 5 (P) (1) (ii)), there was nothing to be found in either the Constitution or the acts of the General Assembly which even remotely resembled a grant of the referendum power to the voters of Anne Arundel County, at least as of the time of the zoning referendum in November 1974.[5] Thus, say appellants, § 308 must be deemed a nullity, since it purports to reserve to the county citizenry a power which it had never validly acquired.[6]

Resolution of the complex constitutional claim presented in these cases turns on the nature and scope of the rights of local self-government guaranteed to county residents by Article XI-A of the Constitution as implemented by Article 25A. From the time of the establishment of the first county administration (St. Mary's) around the year 1637, *see* 1 J. Scharf, *History of Maryland* 123 (1967 ed.), to the first decade of the twentieth century, residents of Maryland's 23 counties enjoyed no appreciable measure of local self-determination. Being nothing more than political subdivisions of the state, counties were considered to be mere administrative

---

5. Subsequent to the zoning referendum in dispute here, the General Assembly enacted Chapter 83 of the Laws of 1976, now codified as Code (1957, 1973 Repl. Vol., 1977 Cum. Supp.) Art. 25A, § 8, which amended the Express Powers Act in an attempt to give statutory support to the exercise of the right of referendum by citizens of chartered counties. *See* Allen v. Hollingsworth, 246 Ky. 812, 56 S.W.2d 530 (1933) (upholding power of legislature to grant right of referendum to residents of municipalities in absence of constitutional authorization). Whatever the need for such legislation — in light of our holding in the instant case — it is clear that Chapter 83 could not retroactively affect the validity of the 1974 election. Therefore, the legality of the Anne Arundel County zoning referendum must rest on some other ground.

6. Interestingly, the Constitution explicitly guarantees the right of referendum over local legislation to the residents of all counties except those opting for a charter form of government under Md. Const., Art. XI-A. Voters in "code counties" enjoy the referendum power by reason of Md. Const., Art. XI-F, § 7, while residents of non-home rule counties exercise this power over public local laws pursuant to Md. Const., Art. XVI, § 3. Despite the lack of express constitutional authority, several charter counties in addition to Anne Arundel County have reserved the right of referendum by charter provision. *See, e.g.*, Baltimore County Charter, § 309; Montgomery County Charter, § 114; Prince George's County Charter, § 319.

instrumentalities of state government, public corporations, subject at all times to the plenary control of the Legislature and possessing only those limited powers which had been delegated by the General Assembly, together with such implied powers as were necessary for the execution of the powers expressly granted. *Howard County v. Matthews,* 146 Md. 553, 561, 127 A. 118 (1924); *County Comm'rs of Talbot County v. County Comm'rs of Queen Anne's,* 50 Md. 245, 259 (1879); *Baltimore v. State,* 15 Md. 376, 462, 74 Am. Dec. 572 (1860). For the historical background of early county government in Maryland, *see* J. McMahon, *An Historical View of the Government of Maryland* 79-97 (1831). By and large, these delegated powers of local government were wielded by county commissioners who, like members of the levy and provincial courts before them, were administrative officials concerned primarily with the collection and disbursement of revenues to pay for needed county services. Code (1957, 1973 Repl. Vol. & 1977 Cum. Supp.) Art. 25; *City of Bowie v. County Comm'rs,* 258 Md. 454, 461-62, 267 A. 2d 172 (1970); *Schneider v. Lansdale,* 191 Md. 317, 324-26, 61 A. 2d 671 (1948); *Cox v. Anne Arundel County,* 181 Md. 428, 433-34, 31 A. 2d 179 (1943). As for county residents, beyond the right to elect county commissioners and state legislators, they had limited authority to control or shape the form of county government, a matter which had always been dictated by the General Assembly. Lacking constitutional recognition as a distinct political entity within the state, *Maryland v. Baltimore & Ohio R.R. Co.,* 44 U. S. (3 How.) 534, 550-51, 11 L. Ed. 714 (1845), *aff'g,* 12 G. &. J. 399, 38 Am. Dec. 317 (1842), the county electorate, as such, could not effectively direct or influence the formulation of policy affecting purely local concerns.

The waning years of the nineteenth century witnessed the birth of a national movement, the purpose of which was to restore and revitalize local government by giving citizens of counties and municipalities the power to legislate as to local matters free from undue encroachment by state legislatures. In Maryland, as elsewhere, the "Home Rule" movement was fueled by widespread public indignation over excessive

legislative interference with and insensitivity toward local problems and concerns, and by a growing dissatisfaction with the enormously inefficient system of performing local law-making functions at the state level. J. Hurst, *The Growth of American Law* 234 (1950); *see Steimel v. Board,* 278 Md. 1, 6-7, 357 A. 2d 386 (1976); *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 311-12, 255 A. 2d 376 (1969); *Scull v. Montgomery Citizens,* 249 Md. 271, 274, 239 A. 2d 92 (1968). It was this popular demand for increased local autonomy that led ultimately to the ratification of Article XI-A at the general election of November 1915.

The theory behind the principle of home rule is that the closer those who make and execute the laws are to the citizens they represent, the better are those citizens represented and governed in accordance with democratic ideals. *State v. City of Milwaukie,* 231 Or. 473, 373 P. 2d 680, 685 (1962). It is said that since the opportunity for popular participation and maximum public awareness of government is greatest at the local level, the likelihood of governmental arbitrariness and imposition is diminished by strengthening local political control over local concerns. *See* Fordham, *Decision-Making in Expanding American Urban Life,* 21 Ohio St. L. J. 274, 275 (1960).

Although this Court has stated that the Home Rule Amendment was intended to secure to the citizens of Maryland "the fullest measure of local self-government" in respect of their local affairs, *State v. Stewart,* 152 Md. 419, 422, 137 A. 39 (1927), Article XI-A in actuality does not constitute a grant of absolute autonomy to local governments. J. Spencer, *Contemporary Local Government in Maryland* 21 (1965). Rather, by providing for the transfer to the counties, within well-defined limits, of legislative powers formerly reserved to the General Assembly, Article XI-A affords chartered counties a certain measure of independence from the State Legislature. *County Council v. Investors Funding,* 270 Md. 403, 418, 312 A. 2d 225 (1973); *Murray v. Director of Planning,* 217 Md. 381, 389, 143 A. 2d 85 (1958). For a general discussion of county self-government in Maryland, see Moser, *County Home Rule — Sharing the*

*State's Legislative Power with Maryland Counties,* 28 Md. L. Rev. 327 (1968).

The exercise of local legislative powers is subject at all times to provisions of the Constitution and general law, and is limited to those matters allocated by the express powers which the Legislature has delegated under Article 25A of the Annotated Code. Md. Const., Art. XI-A, §§ 1 & 3; *Mont. Citizens League v. Greenhalgh,* 253 Md. 151, 158, 252 A. 2d 242 (1969); J. Spencer, *Contemporary Local Government in Maryland* 22 (1965). Article XI-A does not in and of itself confer *legislative* power upon the counties. Instead it mandates that the General Assembly expressly enumerate and delegate those powers exercisable by counties electing a charter form of government. Md. Const., Art. XI-A, § 2. In compliance with this constitutional injunction, the Legislature enacted in 1918 the Express Powers Act, which, as amended, endows charter counties with a wide array of legislative and administrative powers over local affairs. Art. 25A, § 5. These "legislative powers" are those usually associated with the objects of government — that is, powers to legislate for the benefit of the health, safety and general welfare of the local community.[7]

Once a particular power has been delegated under Article 25A, the Home Rule Amendment forbids the State Legislature from enacting any further public local laws within the scope of the express power so granted, Art. XI-A, § 4; *State's Atty v. City of Balto.,* 274 Md. 597, 606, 337 A. 2d 92 (1975), until such time as the Legislature withdraws the power by public general law. Moreover, under Art. XI-A, § 3 the county council of a chartered county has full power to enact local laws and to repeal or amend local laws of the General Assembly applicable solely to the county, so long as the county legislation is covered by one or more of the express powers enumerated in Article 25A.

---

7. Examples of what we have termed local "legislative powers" are set forth in Article 25A, § 5 and include among others: the power to provide for the protection of county property, to prevent, abate and remove nuisances, to provide for repair of highways, bridges and streets, to pass local fish and game laws, to enact laws pertaining to the development and administration of a comprehensive recreational program, and to provide for zoning of local real estate.

Despite the expansive grant of authority effected by the Express Powers Act, the legislative power of Maryland's charter counties nevertheless remains vulnerable to amendment or perhaps even extinction at the discretion of the Legislature. Moser, *County Home Rule,* 28 Md. L. Rev. 327, 342-43 (1968). This is because the local law-making power exists by reason of a statutory grant of authority; the legislative power of a charter home rule county is not and never has been constitutionally secured.

There are, however, certain powers implicit in Article XI-A which do not qualify as legislative powers and which do not require implementing legislation to render them operative. These powers necessarily proceed from § 1 of the Home Rule Amendment and have as their object the initial organization and formation of charter government in the counties. See Appendix. Article XI-A, § 1 effectively reserves to the people of this state the right to organize themselves into semi-autonomous political communities for the purpose of instituting self-government within the territorial limits of the several counties. The means by which the inhabitants acquire such autonomy is the charter. Being, in effect, a local constitution, the charter fixes the framework for the organization of the county government. *In re Pfahler,* 150 Cal. 71, 88 P. 270, 275, 11 L. R. A., N.S., 1092 (1906); *cf. Harford County v. Schultz,* 280 Md. 77, 85, 371 A. 2d 428 (1977); *Anne Arundel County v. Moushabek, supra,* 269 Md. at 422 (charter is to local legislative body as Constitution is to General Assembly). It is the instrument which establishes the agencies of local government and provides for the allocation of power among them.

From beginning to end, the charter adoption and ratification process is an act of the people, an expression of the local popular will to which the Maryland Constitution has attached fundamental legal significance. Thus, the preamble to the Charter of Anne Arundel County provides in its entirety:

"We, the People of Anne Arundel County, State of Maryland, in order to form a more orderly County government, establish separate legislative and

executive branches, insure responsibility of and accountability for public funds, promote the general welfare and secure the benefits of home rule, do, in accordance with the Constitution and the laws of the State of Maryland, adopt, ordain, and establish as our Charter and form of government this Charter of Anne Arundel County, Maryland."

Furthermore, under the procedures set out in §§ 1 and 1A of Article XI-A, a proposed charter cannot become operational until it receives the imprimatur of the people through ratification at a popular election. From this it can be seen that the power to *establish* and *organize* local government springs directly from Article XI-A and thus lies beyond the competence of the General Assembly or any other branch of state government to alter or erase.

Consequently, in adopting a home rule charter the people have the right to make provision therein for any form of government they deem suitable for their needs, so long as they do not in the process run afoul of the letter and spirit of the Federal and State Constitutions. Their right to adopt a particular form of government, in contradistinction to the power to enact local legislation, is in no way dependent on legislative authorization or enactment. *See State v. City of Lincoln,* 137 Neb. 97, 288 N. W. 499, 502 (1939); *see In re Pfahler, supra,* 88 P. at 275.

To summarize then, Article XI-A was intended to encompass two distinct categories of home rule powers: the power to enact local law (legislative power) and the power to form and establish local government. Thus, with regard to the present appeals, it is incumbent upon us to determine in which of these two classes of home rule powers the right to referendum by petition secured by § 308 properly belongs. If the referendum is a power arising under § 1 of Article XI-A, that is, one respecting the formation and structure of local government, we need look no further to identify the grounds for upholding the constitutionality of § 308, since the referendum would then have been a power vested directly in the people of Anne Arundel County under the Home Rule Amendment. But if the referendum falls outside the ambit of

Article XI-A, § 1, its exercise must have been expressly authorized by the Legislature.

By the term "referendum," we mean that power of direct legislation through the exercise of which the people of a state or a political subdivision may approve or reject an act or other measure passed by a legislative body. *Anne Arundel Co. v. McDonough,* 277 Md. 271, 283, 354 A. 2d 788 (1976); *Beall v. State,* 131 Md. 669, 678, 103 A. 99 (1917).[8] It is customary to draw a distinction between compulsory referenda on the one hand and optional or "facultative" referenda on the other. Where the Legislature directs that a given statute not take effect until and unless approved by a vote of the electorate, it is described as "compulsory." *See, e.g., Bradshaw v. Lankford,* 73 Md. 428, 21 A. 66, 11 L. R. A.. 582 (1891); *Hammong v. Haines,* 25 Md. 541, 90 Am. Dec. 77 (1866); *Burgess v. Pue,* 2 Gill 11 (1844). Where, however, the people are authorized, usually by constitutional reservation, to require submission of a bill for their approval by petition, even though the Legislature is silent on the matter of a plebiscite, the voters are said to possess the power of facultative referendum. It is to this latter category that § 308 of the Anne Arundel County Charter belongs.[9]

---

8. Although the referendum may have been known in early colonial America and still persists as a feature of the celebrated New England town meeting form of government, it was for the most part the brainchild of the Populist and Progressive movements which dominated national politics in the late nineteenth and early twentieth centuries. E. Oberholtzer, *The Referendum in America* (3d ed. 1912). American political reformers in turn borrowed the theory and institutions of direct democracy from the Swiss, who had incorporated the referendum into their federal constitution as early as 1868, and much earlier in the individual cantons. Lowell, *The Referendum in Switzerland and in America,* 73 Atlantic Monthly 517 (1894); *see also* Town of Glenarden v. Bromery, 257 Md. 19, 23 n. 1, 262 A. 2d 60 (1970). Popular support for the direct legislation movement in the United States was short-lived, lasting only about 20 years (1898-1918), during which time the referendum was adopted by 22 states including Maryland. Md. Const., Art. XVI (ratified, Nov. 2, 1915). With the exception of Alaska in 1959, no state has since adopted or jettisoned the referendum. *See* Constitutional Convention Commission of Md., *Constitution Revision Study Documents —* *Direct Legislation* 102-106 (1968); Council of State Governments, *The Book of the States 1976-1977* 216-17 (1976).

9. Prior to 1915, facultative referendum was thought to be impossible in Maryland on the theory that the authority to enact, repeal or amend laws had been vested exclusively in the General Assembly — the people having completely transferred all legislative power to the Legislature. Cole v. Secretary of State, 249 Md. 425, 434, 240 A. 2d 272 (1968); *see* Brawner v.

Described recently by the United States Supreme Court as a "basic instrument of democratic government," *Eastlake v. Forest City Enterprises, Inc.,* 426 U. S. 668, 679, 96 S. Ct. 2358, 49 L.Ed.2d 132 (1976), and by the California Supreme Court as "one of the outstanding achievements of the progressive movement of the early 1900's," *Associated Home Builders v. City of Livermore,* 18 Cal. 3d 582, 135 Cal. Rptr. 41, 557 P. 2d 473, 477 (1976), the referendum is an integral component of the legislative process whenever authorized. *See Spaulding v. Blair,* 403 F. 2d 862, 863 (4th Cir. 1968). In this respect, it differs little from other procedural steps in the law-making mechanism, such as the requirement that bills pass the legislative body or provisions for executive veto where the latter exists.

It is evident that the referendum power reserved in § 308 directly affects the distribution of political power between the people of Anne Arundel County and their elected legislative representative body, the County Council, and thus is a fundamental feature of the overall structure of county government. By establishing what is in effect a coordinate legislative entity, that is, the county electorate, the § 308 referendum is as much an element of the local political decision-making apparatus as the County Executive or the County Council itself. As such, referendum by petition is quite clearly a power affecting the form or structure of local government and therefore belongs to that class of powers vested directly in the people of the several counties by Article XI-A, § 1. As we have previously stated, these powers do not

---

Supervisors, 141 Md. 586, 595, 119 A. 250 (1922); Kenneweg v. Allegany County, 102 Md. 119, 122-23, 62 A. 249 (1905). In response to the public outcry over corruption in state government and alleged abuses of legislative power, the General Assembly proposed and the people ratified Article XVI, reserving the right of referendum by petition with respect to public general and local laws enacted by the *General Assembly.* J. Wheeler & M. Kinsey, *Magnificent Failure: The Maryland Constitutional Convention of 1967-68* 142 (1970); *see* Beall v. State, 131 Md. 669, 677-78, 103 A. 99 (1917); Bd. of Ed. v. Mayor of Frederick, 194 Md. 170, 176-77, 69 A. 2d 912 (1949); Note, 3 Stan. L. Rev. 497, 497-98 (1951). Although § 308 of the Anne Arundel County Charter was patterned after the state-wide referendum article, Reporter's Note to § 308, all parties agree that Article XVI has no application to legislation passed by county councils pursuant to a grant of home rule authority.

depend for their exercise on the passage of implementing legislation by the General Assembly. *See* M. Levitt & E. Feldbaum, *State and Local Government and Politics* 45 (1973).

Appellants would argue, however, that the reservation of the power to repeal or amend local legislation by plebiscite is inconsistent with § 3 of the Home Rule Amendment, which mandates that the county councils of charter counties "shall have *full power* to enact local laws" for the county (emphasis added). It is argued that the effect of § 308 is to place a portion of the law-making power in the people in derogation of what appellants would term the plenary power of the County Council. We cannot agree.

Art. XI-A, § 3 provides in relevant part:

> "Every charter so formed shall provide for an elective legislative body in which shall be vested the law-making power of said ... County. Such legislative body ... in any county shall be known as the County Council of the County.... From and after the adoption of a charter by ... any County of this State, as hereinbefore provided, ... the County Council of said County, subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws of said ... County including the power to repeal or amend local laws of said ... County enacted by the General Assembly, upon all matters covered by the express powers granted as above provided; ...."

The first sentence of this section, which sets out the constitutional restrictions on the people's charter-making power, simply requires that the charter include a provision establishing a legislative body "in which shall be vested the law-making power." No attempt was made by the framers to confine the power to legislate exclusively to the council. There is nothing in this clause which would purport to prohibit the exercise of some portion of this power by the people.[10] The

---

**10.** Seeking to circumvent the restrictions imposed by § 3, appellees contend that the referendum power is in effect a veto and therefore is not properly considered to be an exercise of legislative power in conflict with the

effect of the language in the opening sentence of § 3 is to render the council the ultimate repository of all legislative power possessed by the county and not expressly reserved to some other body, such as the electorate. Section 3 undoubtedly requires that the council be the primary legislative organ; it does not altogether preclude the existence of other entities with coordinate legislative powers. *State v. City of Duluth,* 134 Minn. 355, 159 N. W. 792, 795 (1916); *Pittman v. Drabelle,* 267 Mo. 78, 183 S. W. 1055, 1057 (1916); *Mollner v. City of Omaha,* 169 Neb. 44, 98 N.W.2d 33, 39 (1959).

Likewise, the declaration in § 3 that the council have "full power" to enact local laws does not imply exclusivity. Rather, it is more likely that the phrase "full power" was meant to describe the *quality* of the legislative power vested in the council and granted by the General Assembly. In other words, with respect to the powers delegated to it, the County Council is to have as ample and complete power to legislate over local affairs as the General Assembly possessed prior to the ratification of Article XI-A and the enactment of the Express Powers Act. *See Mobile School Comm'rs v. Putnam,* 44 Ala. 506, 537 (1870); *Brairton v. Gillette,* 40 Misc. 2d 1009, 244 N.Y.S.2d 513, 516 (1963), *aff'd mem.,* 23 App. Div.2d 537, 255 N.Y.S.2d 831 (1965); *see also Baltimore City v. Flack,* 104 Md. 107, 122, 64 A. 702 (1906) (full power does not mean conditional power). Thus, while Article XI-A, § 3 bestows upon the county council ample and complete power to legislate within the limits set forth in the Express Powers Act, it does not necessarily confer the exclusive power to do so.

---

law-making authority vested in the county councils of charter counties. While there is some authority to support this position, *see* Morra v. City Clerk of New Bedford, 340 Mass. 240, 163 N.E.2d 268, 270 (1960); State v. Summers, 33 S. D. 40, 144 N.W. 730, 732 (1913), the better reasoned view, in our opinion, is that the referendum, as well as the veto power vested in the executive, is an aspect of the legislative power much like that invoked by the Senate when it considers a bill passed by the House. State v. Alderson, 49 Mont. 387, 142 P. 210, 213 (1914); *accord,* State v. Brantley, 112 Miss. 776, 113 Miss. 786, 74 So. 662, 666 (1917); Gottstein v. Lister, 88 Wash. 462, 153 P. 595, 600 (1915); *see* 1. T. Cooley, *A Treatise on Constitutional Limitations* 320-26 (8th ed. 1926).

We hold therefore that Article XI-A, § 1 conferred upon the citizens of Anne Arundel County the right to reserve unto themselves by express charter provision the power to refer legislation enacted by the Anne Arundel County Council. Given this conclusion and in view of the general presumption of validity accorded county charter provisions, *Harford County v. Schultz, supra,* 280 Md. at 85; *Wilson v. Bd of Sup. of Elec.,* 273 Md. 296, 300-301, 328 A. 2d 305 (1974), it follows that § 308 of the Charter of Anne Arundel County is constitutional and that the referendum election held pursuant thereto, repealing Bill No. 52-73, is valid.

## II

Having established the legality of the 1974 referendum, we now address appellants' final contention, that this popular repeal of Bill No. 52-73 had the effect of leaving their respective properties subject to no zoning classification at all. By successfully scuttling Bill No. 52-73, the voters of Anne Arundel County simultaneously negated the repeal of and thereby revived Bill No. 136-72. The question on which the parties differ, however, is the form taken by Bill No. 136-72 following its reinstatement.

It will be recalled that the 97 amendments to Bill No. 136-72 were voided on procedural grounds by our decision in *Anne Arundel County v. Moushabek, supra,* 269 Md. 419. Thus, the only remaining valid zoning legislation applicable to appellants' realty was the unamended version of Bill No. 136-72. But, say appellants, the County Council would never have intended to permit those portions of Bill No. 136-72 (including, in particular, those provisions governing the classification of appellants' properties) to become law in their unamended form. Accordingly, it is argued, only those portions of original Bill No. 136-72 which were never the subject of amendment survived the *Moushabek* decision, and hence were the only provisions capable of being reinstated by the 1974 zoning referendum. Among those unamended provisions was § 4, which repealed all preexisting zoning legislation governing appellants' properties. Since § 4 was

unaffected by *Moushabek,* the ultimate result was to render their properties completely unzoned.

We need not dwell long on this rather convoluted argument, since, in our opinion, the decision in *Moushabek* necessarily determines the outcome here. Moreover, we decline appellants' invitation to overrule that decision. In *Moushabek,* having determined that the 97 amendments to Bill No. 136-72 were enacted in violation of the procedural requirements of § 307 of the Anne Arundel County Charter and were therefore void, we then undertook to decide whether the invalid amendments were severable from the remainder of Bill No. 136-72. Judge Smith, speaking for the Court, answered this question in the affirmative:

> "It is obvious that council and executive regarded these amendments as severable from the main body of the ordinance. Otherwise, the executive would not have vetoed some of the amendments and the council would not have sustained the veto to part, but not all, of those amendments. Had there been no amendments, the ordinance would have been complete as a vehicle for determining the permitted land uses in the district.... [T]hese parts may be eliminated and the legislative intention easily carried out. Accordingly, the chancellor erred in not determining that the ordinance was severable." 269 Md. at 430.

As a result of our holding in *Moushabek,* Bill No. 136-72 in its unamended form became the operative law. It was this version of Bill No. 136-72 that the County Council attempted to repeal by emergency Bill No. 52-73 in July 1973. And consequently it was this unamended version of Bill No. 136-72 which was automatically reinstated after Bill No. 52-73 went down to defeat at the hands of the electorate in 1974. Since we have not been informed of any subsequent action by the County Council with respect to the zoning of appellants' properties, we conclude that these parcels were subject to the

zoning restrictions set forth in the maps adopted by unamended Bill No. 136-72.

*Decrees of the Circuit Court for Anne Arundel County affirmed; costs to be paid by appellants.*

## APPENDIX

### ARTICLE XI-A

"Section 1. Charter boards; preparation and adoption of charter.

"On demand of the Mayor of Baltimore and City Council of the City of Baltimore, or on petition bearing the signatures of not less than 20% of the registered voters of said City or any County (Provided, however, that in any case 10,000 signatures shall be sufficient to complete a petition), the Board of Election Supervisors of said City or County shall provide at the next general or congressional election, occurring after such demand or the filing of such petition, for the election of a charter board of eleven registered voters of said City or five registered voters in any such Counties. Nominations for members for said charter board may be made not less than forty days prior to said election by the Mayor of Baltimore and City Council of the City of Baltimore or the County Commissioners of such County, or not less than twenty days prior to said election by petition bearing the signatures written in their own handwriting (and not by their mark) of not less than 5% of the registered voters of the said City of Baltimore or said County; provided, that in any case Two thousand signatures of registered voters shall be sufficient to complete any such nominating petition, and if not more than eleven registered voters of the City of Baltimore or not more than five registered voters in any such County are so nominated their names shall not be printed on the ballot, but said eleven registered voters in the City of Baltimore or five in such County shall constitute said charter board from and after the date of said election. At said election

the ballot shall contain the names of said nominees in alphabetical order without any indication of the source of their nomination, and shall also be so arranged as to permit the voter to vote for or against the creation of said charter board, but the vote cast against said creation shall not be held to bar the voter from expressing his choice among the nominees for said board, and if the majority of the votes cast for and against the creation of said charter board shall be against said creation the election of the members of said charter board shall be void; but if such majority shall be in favor of the creation of said charter board, then and in that event the eleven nominees of the City of Baltimore or five nominees in the County receiving the largest number of votes shall constitute the charter board, and said charter board, or a majority thereof, shall prepare within twelve months from the date of said election a charter or form of government for said city or such county and present the same to the Mayor of Baltimore or President of the Board of County Commissioners of such county, who shall publish the same in at least two newspapers of general circulation published in the City of Baltimore or County within thirty days after it shall be reported to him. Such charter shall be submitted to the voters of said City or County at the next general or Congressional election after the report of said charter to said Mayor of Baltimore or President of the Board of County Commissioners; and if a majority of the votes cast for and against the adoption of said charter shall be in favor of such adoption, the said charter from and after the thirtieth day from the date of such election shall become the law of said City or County, subject only to the Constitution and Public General Laws of this State, and any public local laws inconsistent with the provisions of said charter and any former charter of the City of Baltimore or County shall be thereby repealed."