*Benedict J. Frederick, III, et al. v. Baltimore City Board of Elections, et al.*, No. 35, September Term, 2023. Opinion by Gould, J.

**CHARTER AMENDMENTS – LOCAL GOVERNMENT HOME RULE – POWER TO SET PROPERTY TAX RATES**

The Supreme Court of Maryland held that section 6-302 of the Tax-Property Article of the Annotated Code of Maryland, which grants the Mayor and City Council of Baltimore the power to set rates for taxing real and personal property, must be construed with the limitation provided in section 49 of Article II of the Charter of the City of Baltimore, that its voters may not initiate any legislation relating to the classification or taxation of property.

**CHARTER AMENDMENTS – LOCAL GOVERNMENT HOME RULE – POWER TO SET PROPERTY TAX RATES**

The Supreme Court of Maryland held that a proposed amendment to the Charter of the City of Baltimore was impermissible because it violated section 6-302(a) of the Tax-Property Article of the Annotated Code of Maryland as applied to the City of Baltimore, by allowing its citizens to establish the tax rate.

Circuit Court for Baltimore City
Case No.: C-24-CV-24-001361
Argued: August 28, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 35

September Term, 2023

_____

BENEDICT J. FREDERICK, III, et al.

v.

BALTIMORE CITY BOARD OF
ELECTIONS, et al.

_____

Fader, C.J.,
Booth,
Biran,
Gould,
Eaves,
Killough,
Harrell, Glenn T. (Senior Justice,
        Specially Assigned),

JJ.

_____

Opinion by Gould, J.
Fader, C.J., Booth and Harrell, JJ., concur.

_____

Filed: July 1, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Appellants Benedict J. Frederick, III, Matthew W. Wyskiel, III, and Stacie Teal-Locust challenge the decision of the Baltimore City Board of Elections (the "City Board") that rejected a proposed charter amendment petition sponsored by Renew Baltimore, a ballot issue committee. The proposed amendment sought to impose a cap on the City of Baltimore's ("Baltimore City") real property tax rate that incrementally decreased over seven years (the "Property Tax Amendment").

Baltimore City currently has a real property tax rate of $2.248 per $100 of assessed value. The proposed Property Tax Amendment would have added a new section to the Baltimore City Charter, providing that "[n]otwithstanding any other provision of [the] Charter," Baltimore City's property tax rate would be capped at $2.20 per $100 of assessed value, beginning in fiscal year 2026, with the cap decreasing incrementally each year until reaching $1.20 per $100 of assessed value in fiscal year 2032, where it would remain permanently.[1]

---

[1] Specifically, the proposed amendment would have added a new section to Article I to the Baltimore City Charter and provided:

Notwithstanding any other provision of this Charter, and except for property exempt by law, the uniform rate of taxation which shall be levied and imposed on every $100 of assessed or assessable value of real property in Baltimore City, as determined by the Mayor and City Council pursuant to Article II, Section 39 of this Charter, shall be:

(a) for the fiscal year beginning July 1, 2025, no higher than $2.200;

(b) for the fiscal year beginning July 1, 2026, no higher than $2.100;

(c) for the fiscal year beginning July 1, 2027, no higher than $1.920;

On June 6, 2023, Renew Baltimore submitted its proposed petition form to the City Board for an advance determination as to format, pursuant to section 6-202 of the Election Law Article. MD. CODE ANN., ELEC. LAW § 6-202 (2022 Repl. Vol.). The Election Director for the City Board (the "Election Director") approved the petition as to format on June 20, 2023, without making any determination as to the charter amendment's legality.

On June 20, 2024, Renew Baltimore submitted signature pages, purporting to contain 23,542 valid signatures in support of the Property Tax Amendment—more than double the 10,000 signatures required by the Maryland Constitution. *See* MD. CONST. art. XI-A, § 5.

On July 9, 2024, the Election Director determined that the Property Tax Amendment was deficient under section 6-206(c)(5) of the Election Law Article because it sought "the enactment of a law that would be unconstitutional or a result that is otherwise prohibited by law." Specifically, the Election Director concluded that the proposed amendment would conflict with section 6-302(a) of the Tax-Property Article, which vests authority to set the property tax rate with the Mayor and City Council of Baltimore (collectively, the "City").[2]

---

      (d) for the fiscal year beginning July 1, 2028, no higher than $1.740;

      (e) for the fiscal year beginning July 1, 2029, no higher than $1.560;

      (f) for the fiscal year beginning July 1, 2030, no higher than $1.380; and,

      (g) for the fiscal year beginning July 1, 2031, and for each and every fiscal year thereafter, no higher than $1.200.

[2] Section 6-302(a) of the Tax-Property Article provides:

2

On July 12, 2024, Appellants filed a timely complaint against the City Board in the Circuit Court for Baltimore City, seeking judicial review under section 6-209(b) of the Election Law Article. The City and the State Board of Elections intervened as defendants. The City Board moved to dismiss the complaint, or, alternatively, for summary judgment, arguing that the Election Director's determination was legally correct.

Appellants filed a cross-motion for summary judgment, and the City also moved to dismiss the complaint, or, alternatively, for summary judgment.

The circuit court conducted a hearing on all dispositive motions on August 8, 2024. On August 9, the court denied Appellants' motion and granted the motions of the City Board and the City, ruling that the Election Director's determination on the legality of the Property Tax Amendment was correct. The court found that the Property Tax Amendment was "not proper Charter material because it is in violation of Tax-Property § 6-302(a) and allows the citizens of Baltimore to establish the tax rate, leaving nothing for the City Council to legislate because they would be required to lower the tax rate every year[,]" thereby "not leav[ing] any discretion in the hands of the City Council."

Appellants noted a direct appeal to this Court, pursuant to sections 6-209(a)(3)(ii) and 6-210(e)(3)(i)(2) of the Election Law Article.

---

Except as otherwise provided in this section and after complying with § 6-305 of this subtitle, in each year after the date of finality and before the following July 1, the Mayor and City Council of Baltimore City or the governing body of each county annually shall set the tax rate for the next taxable year on all assessments of property subject to that county's property tax.

MD. CODE ANN., TAX-PROP. § 6-302(a) (2019 Repl. Vol., 2024 Supp.).

This Court held oral argument on August 28, 2024. The next day, we entered an order affirming the circuit court:

> Now, therefore, for reasons to be stated later in an opinion to be filed, it is this 29th day of August, 2024, by the Supreme Court of Maryland,
>
> ORDERED, that the Orders signed by the Circuit Court for Baltimore City on August 9, 2024 granting summary judgment in favor of the Baltimore City Board of Elections and the Mayor and City Council of Baltimore and denying the appellants' motion for summary judgment are hereby AFFIRMED. The circuit court correctly determined that the proposed charter amendment impermissibly sets the property tax rate in a manner inconsistent with § 6-302(a) of the Tax Property Article and, therefore, cannot be presented on the November 2024 general election ballot. Costs are to be paid by the appellants and the mandate shall issue forthwith.

*Frederick v. Balt. City Bd. of Elections*, 488 Md. 534, 535-36 (2024).

We now explain our reasoning.

**I**

**A**

Appellants contend that the Property Tax Amendment is a valid cap on the property tax rate that complies with section 6-302(a) of the Tax-Property Article. They argue that this Court's decision in *Board of Supervisors of Elections of Anne Arundel County v. Smallwood*, 327 Md. 220, 238 (1992), approved tax caps as proper charter material, holding that "a limitation on the power of a legislative body to raise revenue is at the heart of the form and structure of our government and thus is proper charter material."

Appellants distinguish their proposed amendment from the "roll back" provisions invalidated in *Smallwood* and the charter provision invalidated in *Hertelendy v. Board of Education of Talbot County*, 344 Md. 676 (1995), which the circuit court cited in its

4

opinion. Appellants assert that those cases involved limitations on the property tax revenue that could be collected, whereas the Property Tax Amendment only caps the tax rate, without imposing any limitations on revenue. Appellants emphasize that the Property Tax Amendment would not divest the City of its authority to set the tax rate because it would retain the discretion to set any rate below the specified cap.

Appellants further argue that there is unrefuted expert evidence in the record that the proposed tax caps would increase property tax revenue in Baltimore City over time, by stimulating economic growth and expanding the tax base. In support, they cite an economic analysis by Sage Policy Group (the "Sage Analysis") that employed "dynamic analysis" to conclude that real property tax collections would rise each fiscal year during implementation of the proposed caps, resulting in approximately $62 million higher annual tax collections than at present by fiscal year 2032.

Finally, Appellants assert that section 49 of Article II of the Baltimore City Charter, which provides that "nothing herein contained shall give to the City or to the inhabitants thereof the right to initiate any legislation, laws or ordinances relating to the classification and taxation of real and personal property[,]" does not apply to their proposed charter amendment because a charter amendment is not "legislation, laws or ordinances[.]"

**B**

Appellees contend that the Election Director correctly determined that the proposed Property Tax Amendment would conflict with section 6-302(a) of the Tax-Property Article because it requires the City to "set the tax rate for the next taxable year" annually. They argue that this Court's decisions in *Smallwood* and *Hertelendy* establish that a local charter

5

amendment may not set the property tax rate or transfer rate-setting power from the local legislative body to the voters.

Appellees distinguish the tax caps approved in *Smallwood* from the caps proposed by Appellants, noting that the *Smallwood* caps merely limited future increases in property tax revenue beyond the current level, whereas the Property Tax Amendment would force the City to reduce the current tax rate progressively over several years. Appellees contend that when a "cap" is set below the existing level of taxation, as with the Property Tax Amendment, it effectively sets the tax rate, rather than merely limits it.

The City further argues that the Property Tax Amendment is not proper charter material under *Cheeks v. Cedlair Corp.*, 287 Md. 595 (1980), and *Save Our Streets v. Mitchell*, 357 Md. 237 (1998), because it is legislative in nature and would completely remove the City Council's discretion and control in an area under its authority. The City also contends that in chapter 555 of the 1920 Laws of Maryland (now codified as CHARTER OF BALT. CITY art. II, § 49), the General Assembly expressly limited the Baltimore City voters' power to amend their charter to exclude any amendments "relating to the classification and taxation of real and personal property."

Finally, the City asserts that the proposed amendment would reduce its total revenue by approximately 25%, or roughly half a billion dollars annually, thereby jeopardizing the City's ability to perform its duties required by law. It also disputes the Sage Analysis, arguing that the drastic tax cuts mandated by the amendment would make it nearly impossible for the City to pay for the services and programs it is legally obligated to provide.

**II**

This case implicates the nature and scope of local government "home rule" in Maryland in general, and in Baltimore City specifically. Our analysis, therefore, begins with the basic principles of home rule in Maryland and then considers how those principles were applied in the two cases on which the parties mostly focus: *Smallwood* and *Hertelendy*. From there, we explore how home rule was adopted and evolved in Baltimore City, including the specific powers granted to and withheld from the City by the General Assembly. As explained below, the unique features of the scope of Baltimore City's home rule power lead us to conclude that the Property Tax Amendment ran afoul of section 6-302(a) of the Tax-Property Article.

**A**

For nearly 300 years, residents of Maryland's counties "enjoyed no appreciable measure of local self-determination." *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel Cnty.*, 283 Md. 48, 54 (1978). Maryland's 23 counties were seen as "administrative instrumentalities of state government[.]" *Id.* at 54-55. County residents, therefore, had limited ability to "shape the form of county government" or the policies "affecting purely local concerns." *Id.* at 55. Such concerns were addressed, if at all, by the General Assembly. *Id.*

Counties first received the option of self-governance when, in 1915, Article XI-A of the Maryland Constitution—known as the "Home Rule Amendment"—was ratified. *Ritchmount*, 283 Md. at 56. The Home Rule Amendment applied to all Maryland counties,

as well as to Baltimore City, but in some respects the amendment had provisions applicable only to Baltimore City. Those differences will be noted and returned to later in this opinion.

Section 1 of the Home Rule Amendment granted the counties and Baltimore City the right to elect home rule by adopting a charter. A charter "is the instrument which establishes the agencies of local government and provides for the allocation of power among them." *Id.* at 58. Through a charter, residents can establish "any form of government they deem suitable for their needs," subject only to "the Federal and State Constitutions." *Id.* at 59. Put another way, a charter establishes both the "formation and structure of local government[.]" *Id.* A local constitution of sorts. *Id.* at 58.

The Home Rule Amendment was not self-executing; that is, it did not effectuate a transfer of any of the General Assembly's legislative authority to the local government that adopted a charter. *Id.* at 56. That explains the necessity for section 2 of the Home Rule Amendment, which provides:

> The General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly.

MD. CONST. art. XI-A, § 2.

Notice that section 2 refers to "the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland[.]" We will return to that qualification and its significance later, but for now—to understand *Smallwood*

8

and *Hertelendy*—the relevant points are that: (1) section 2 required the General Assembly to both determine the powers it would give counties that elected home rule and then expressly grant such powers through the adoption of a general law; and (2) the General Assembly has the power to take such powers away.

As required by section 2 of the Home Rule Amendment, the General Assembly enacted the "Express Powers Act, which, as amended, endows charter counties with a wide array of legislative and administrative powers over local affairs." *Ritchmount*, 283 Md. at 57. Under section 3 of the Home Rule Amendment, charter counties have no powers other than those granted under that statute. MD. CONST. art. XI-A, § 3 (A charter county or Baltimore City, if it adopts a charter, "shall have full power to enact local laws of said City or County including the power to repeal or amend local laws of said City or County enacted by the General Assembly, upon all matters covered by the express powers granted as above provided[.]"). The Express Powers Act did not apply to Baltimore City; instead, the General Assembly's grant of power to Baltimore City followed a different path, as explained below.

Section 3 of the Home Rule Amendment also required any charter adopted under section 1 to establish a legislative body—called the City Council for Baltimore City and County Council for charter counties—"in which shall be vested the law-making power of" the home rule jurisdiction. MD. CONST. art. XI-A, § 3. "In short, under [section 3], in a local jurisdiction governed by charter, only the local legislature may enact local laws, *i.e.,* legislation." *Balt. City Bd. of Elections v. Mayor and City Council of Balt.*, 489 Md. 465, 479 (2025).

9

Amendments to charters, however, could be initiated by the voters or the City Council or County Councils under section 5 of the Home Rule Amendment:

> Amendments to any charter adopted by the City of Baltimore or by any County of this State under the provisions of this Article may be proposed by a resolution of the Mayor of Baltimore and the City Council of the City of Baltimore, or the Council of the County, or by a petition signed by not less than 20% of the registered voters of the City or County, provided, however, that in any case 10,000 signatures shall be sufficient to complete a petition. A petition shall be filed with the Mayor of Baltimore or the President of the County Council. An amendment so proposed shall be submitted to the voters of the City or County at the next general or congressional election occurring after the passage of the resolution or the filing of the petition. If at the election the majority of the votes cast for and against the amendment shall be in favor thereof, the amendment shall be adopted and become a part of the charter of the City or County from and after the thirtieth day after said election. The amendments shall be published by the Mayor of Baltimore or President of the County Council once a week for five successive weeks prior to the election in at least one newspaper published in said City or County.

MD. CONST. art. XI-A, § 5.

Before we turn our attention to *Smallwood* and *Hertelendy*, let's recap the foundational principles just discussed: (1) the Home Rule Amendment allowed counties and Baltimore City to elect home rule by adopting a charter; (2) the charter must establish a legislative body that is vested with *all* lawmaking power of the charter jurisdiction; (3) the charter jurisdiction had no powers other than those expressly granted by the General Assembly; (4) what powers the General Assembly giveth, the General Assembly may taketh away; and (5) although the legislative power belongs to the legislative body, amendments to the charter may be initiated by either the voters or the legislative body.

10

# B

## 1

In *Smallwood*, this Court addressed the validity of voter-initiated proposed charter amendments that would have placed caps on property tax revenues in Anne Arundel and Baltimore Counties. 327 Md. at 228. The Baltimore County amendment proposed adding language to the County Charter that would have: (1) established a "roll back" provision limiting property tax revenues for tax year 1991-1992 to no more than the amount collected in tax year 1989-1990; (2) created a percentage tax cap allowing increases in future years' property tax revenues by no more than two percent per year; and (3) implemented an "escape clause" permitting the County Council to exceed the two percent cap, if approved by two-thirds of qualified voters. *Id.* at 229. The Anne Arundel County amendment proposed modifying its County Charter with comparable provisions, but with a 4.5% cap and a different base year. *Id.* at 231-32.

One of the issues we considered was whether the proposed voter-initiated amendment was truly an amendment—which voters were permitted to initiate under section 5 of the Home Rule Amendment—or legislation, which, under section 3, voters had no authority to initiate. *Id.* at 235-36. We noted that "[t]he basic function of a constitution or a charter is to distribute power among the various agencies of government, and between the government and the people who have delegated that power to their government." *Id.* at 237. We held "that a provision in a county charter placing restrictions upon the county council's revenue raising authority is a fundamental aspect of the form and structure of government and thus is proper charter material." *Id.* at 241.

11

We then shifted our focus to another issue: Whether the proposed amendments conflicted with section 6-302(a) of the Tax-Property Article, which "provides that the government body of a county shall set the tax rate on property for the next taxable year." *Id.* at 242. We distinguished between permissible percentage "tax cap" provisions and impermissible "roll back" and "escape clause" provisions, *id.* at 244-45, and determined that the percentage caps did not violate section 6-302(a) because they "would not have had the effect of allowing the electorate of the two counties to set the tax rates" and also still permitted county councils to exercise discretion within prescribed limits, *id.* at 242. We noted that "[t]here is no language in [section 6-302(a)] indicating that reasonable limits cannot be placed on the legislative power to set the tax rate." *Id.* at 243.

However, we found the "roll back" provisions ran afoul of section 6-302(a) by effectively transferring "the county councils' . . . powers to the voters" and allowing "the voters of Baltimore and Anne Arundel Counties to set the property tax rates for the tax year 1991-1992." *Id.* at 244. Similarly, we deemed the "escape clauses" invalid under section 6-302(a) because they would have allowed voters, rather than county councils, to determine whether tax rates could exceed the caps. *Id.* at 244-45.

**2**

In *Hertelendy*, this Court applied *Smallwood* to invalidate, under the same statutory provision—section 6-302(a) of the Tax-Property Article—a property tax limitation in the Talbot County Charter. 344 Md. at 683-85. The charter provision froze the tax rate at 1978-1979 levels (except for newly constructed or previously unassessed property) and eliminated the County Council's discretion to adjust rates. *Id.* at 678-79. We agreed with

12

the circuit court's conclusion that, unlike the amendments in *Smallwood* where the proposed amendment held open at least a "small window of discretion" for the county councils to exercise, the proposed amendment to the Talbot County Charter provided "no provision for any change whatsoever." *Id.* at 684-85. We also agreed with the circuit court that the proposed amendment violated section 6-302(a) because it fixed the tax rate "at the statutory level for the fullness of time, or at least until the voters agree to relinquish all or part of it." *Id.* at 684.

C

Baltimore City charted a different path to local autonomy than the counties; indeed, Baltimore City had a head start. And because of its unique path towards home rule, *Smallwood* and *Hertelendy* are instructive but not dispositive.

In 1867, the Maryland Constitution was amended to add Article XI, which established Baltimore City's "first independent local government in the form of a mayor and a bicameral legislative body." Martha Frisby Rasin, Case Note, *Charter Home Rule — Charter Material — Exercise of Police Power by Non-Legislative Body — Citizens' Right to Initiate Legislation — Electorate's Exercise of Police Power in Charter Amendment Form Violates Home Rule Amendment of State Constitution. Cheeks v. Cedlair Corp., 287 Md. 595, 415 A.2d 255 (1980)*, 11 U. BALT. L. REV. 158, 171 (1981).

Section 1 of Article XI provided for the election of a mayor and set forth the mayor's compensation, duties, and term. Section 2 provided for the election of a city council and set forth its duties, compensation, and terms. Section 3 established when elections for city council positions must be held. Section 4 provided for the scheduling of city council

13

sessions. Section 5 barred the mayor and city council members from holding other offices. Section 6 provided for the removal of the mayor. Section 7 imposed restrictions on Baltimore City's ability to borrow money. Section 8 ratified all laws and ordinances in effect at the time Article XI was adopted. And, of utmost significance here, section 9 gave the General Assembly the power to make changes to Article XI. In other words, Article XI established the form and structure of Baltimore City's government, and the General Assembly, not the voters, was given the power to change that structure.

In 1898, the General Assembly granted Baltimore City a charter through the passage of chapter 123 of the Acts of 1898. *Balt. City Bd. of Elections*, 489 Md. at 480. The Charter was "codified as Article 4, Section 6 of the Public Local Laws of Maryland." *Id.* It incorporated the inhabitants of Baltimore City as "Mayor and City Council of Baltimore," and granted "numerous legislative powers to the city and established the city council as the local legislative body which, with the mayor, held the authority to exercise the express powers through the passage of ordinances." Rasin at 170 (footnotes omitted). Such powers included what was commonly understood as the State's police powers. *Balt. City Bd. of Elections*, 489 Md. at 480. Baltimore City's inhabitants had no power, however, to alter the form of their local government. Rasin at 170. That power continued to rest with the General Assembly under section 9 of Article XI. *Id.*

Notice the potential tension between section 9 of Article XI and the Home Rule Amendment. Section 1 of the Home Rule Amendment permitted Baltimore City to elect home rule by adopting a charter. A charter jurisdiction's powers are limited to those expressly granted by the General Assembly. Recall that section 2 directed the General

14

Assembly to make an express grant of powers to the county but did not direct the General Assembly to expressly grant any powers to Baltimore City. That's because in 1898, the General Assembly had *already* granted Baltimore City local autonomy under article 4, section 6 of the Public Local Laws of Maryland. That explains the second sentence of section 2:

> Such express powers granted to the Counties and **the powers heretofore granted to the City of Baltimore**, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly.

MD. CONST. art. XI-A, § 2 (emphasis added). So, once Baltimore City adopted a charter under section 1 of the Home Rule Amendment, the powers already granted in 1898 constituted the General Assembly-granted powers necessary to turn Baltimore City into full-fledged home rule jurisdiction.

Well, not quite full-fledged. There was still one shackle that needed removal. Section 9 of Article XI permitted *only* the General Assembly to alter the form and structure of Baltimore City's local government established in sections 1 through 6 of Article XI. That explains why the charter adopted in 1918 "essentially continued the existing mayor and council government, with all legislative power in the council." Rasin at 172 (citing CHARTER OF BALT. CITY art. I, §§ 209, 218, 221 (1918)). It also explains why section 6 of the Home Rule Amendment directed the General Assembly to transfer to the voters its power to amend sections 1 through 6 of Article XI. And until the General Assembly did this, Baltimore City could not enjoy the full benefits of home rule.

15

Baltimore City's wait was over when, in 1920, the General Assembly transferred its powers to the Baltimore City voters in chapter 555 of the Acts of 1920. But when it did so, the General Assembly included another provision that drives the outcome of this case:

> SECTION 1. *Be it enacted by the General Assembly of Maryland,* That the voters of Baltimore City shall have and are hereby expressly granted the power to make such changes in Sections 1 to 6, inclusive, of Article XI of the Constitution of the State of Maryland, as they may deem best; such power to be exercised only by the adoption or amendment of a charter, as provided in Article XI-A of said Constitution; provided, that nothing in this section contained shall be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said City of Baltimore, as set forth in Article XI-A of said Constitution; **and expressly provided, further, that nothing contained in this Act shall give to the Mayor and City Council of Baltimore or to the inhabitants thereof the right to initiate any legislation, laws or ordinances relating to the classification and taxation of real and personal property within the limits of the said City of Baltimore**.

1920 Md. Laws ch. 555 § 1 (second emphasis added). The last sentence of this section represents the General Assembly's intention to "restrict to itself the power to enact laws concerning the classification and taxation of property." *Cheeks*, 287 Md. at 613-14. The grant of powers in chapter 555 of the Acts of 1920 was later incorporated into section 49 of Article II of the City Charter. *Id.* at 613.

It was not until 1929 when, through the passage of section 29 of chapter 226 of the Acts of 1929—the predecessor to today's Tax-Property Article section 6-302—the General Assembly granted to Baltimore City, the power to set rates for taxing real and personal property. In its present form, section 6-302(a) provides:

> Except as otherwise provided in this section and after complying with § 6-305 of this subtitle, in each year after the date of finality and before the following July 1, the Mayor and City Council of Baltimore City or the governing body of each county annually shall set the tax rate for the next

taxable year on all assessments of property subject to that county's property tax.

MD. CODE ANN., TAX-PROP. § 6-302(a) (2019 Repl. Vol., 2024 Supp.).

So, although *Smallwood* and *Hertelendy* provide useful and interesting discussions on where to draw the line under section 6-302 between lawful and unlawful voter involvement in setting property tax rates, here, we have the added wrinkle of chapter 555, applicable only to Baltimore City, which prohibits *any* voter involvement. Section 6-302(a) must be construed with that statutory limitation in mind. *See Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024) (holding that statutory text should be interpreted "within the context of the statutory scheme to which it belongs" (quoting *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021))). Because the Property Tax Amendment was initiated by the voters, it would have violated section 6-302(a).

Accordingly, we affirmed the exclusion of the Property Tax Amendment from the November 2024 general election ballot.

IN THE SUPREME COURT

OF MARYLAND

No. 35

September Term, 2023

_____

BENEDICT J. FREDERICK, III, et al.

v.

BALTIMORE CITY BOARD OF
ELECTIONS, et al.

_____

Fader, C.J.,
Booth,
Biran,
Gould,
Eaves,
Killough,
Harrell, Glenn T. (Senior Justice,
Specially Assigned),

JJ.

_____

Concurring Opinion by Fader, C.J.,
which Booth and Harrell, JJ., join.

_____

Filed: July 1, 2025

I join the Majority opinion in full. I write separately to add my view that, if the issue is presented in a future case, it may be appropriate to reconsider aspects of our holding in *Board of Supervisors of Elections of Anne Arundel County v. Smallwood*, 327 Md. 220 (1992). There, as the Majority explains, citizens in two counties proposed charter amendments that, in relevant part, would have (1) established rollback provisions limiting property tax revenues for a future tax year to no more than the amount collected in a prior tax year; (2) created percentage tax caps limiting the amount by which tax revenues could increase in future years; and (3) enacted "escape clauses" giving voters authority to approve increases greater than the caps. Majority op. at 11-12. The Court in *Smallwood* upheld the percentage tax caps but invalidated the rollback provisions and escape clauses. The Court concluded that the percentage tax caps did not violate § 6-302(a) of the Tax-Property Article because they did not "divest the county councils of the ability to set the property tax rates" each year. 327 Md. at 240. Instead, the Court held, the caps "merely precluded a particular type of enactment by the legislative body, namely the power to collect property taxes above the specified cap." *Id.* But, the Court determined, the rollback provisions and escape clauses violated § 6-302(a) because they "would have allowed the voters of [the respective counties] to set the property tax rates for the" relevant tax years. *Id.* at 244.

In an opinion concurring in part and dissenting in part, Judge Chasanow pointed out that the tax cap and rollback provisions both substantially limited the ability of the respective county councils to set tax rates because they limited the amount of revenue the counties could collect. *See id.* at 251-54 (Chasanow, J., concurring in part and dissenting in part). Judge Chasanow found untenable the distinction the Court's majority drew

between the two mechanisms, both of which imposed limits on the amount of revenue the county councils could authorize, writing that "[t]he majority does not explain why freezing the property tax revenues at those of the prior year violates § 6-302(a), 'which mandates that the governing body of each county is to set the property tax rate for the next tax year,' but simply giving the council authority to increase those fixed property tax revenues by up to 2% makes the provision valid." *Id.* at 253 (citation omitted). Judge Chasanow similarly criticized the logic of the majority in distinguishing the tax caps from the escape clauses, stating that "the majority holds the voters can vote to establish a cap by charter amendment and, in doing so, they *are not* setting the tax rate, but the voters cannot vote to remove the cap in any given year because, in doing so, they *are* setting the tax rate. That could not be the General Assembly's intent."[1] *Id.* at 254.

In my view, Judge Chasanow's critique of the distinctions drawn in the opinion of the *Smallwood* majority raises important questions for which I find no satisfying answers in that majority opinion or in our subsequent case law discussing *Smallwood*. It is not necessary to revisit the Court's opinion in *Smallwood* to decide this case, so I am in full agreement with the Majority's decision not to do so. But the day may come when the Court is called upon to reconsider *Smallwood*. If that day comes, we should be open to the invitation.

---

[1] Chief Judge Murphy, in dissent, disagreed with the Majority's conclusion that any of the provisions under review were appropriate charter material. *Smallwood*, 327 Md. at 248-50 (Murphy, C.J., dissenting). Chief Judge Murphy would have found that the tax provisions "are not addressed to the form or structure of the county government in any fundamental sense and are not, therefore, charter material within the contemplation of § 5 of Art. XI-A of the Maryland Constitution." *Id.* at 250.

Justice Booth and Justice Harrell advise that they join this concurring opinion.